IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


RANDY TURPIN BELL,              )
                                )
      Petitioner,               )
                                )
      v.                        )   CIVIL ACTION NO.
                                )     2:95cv913-T
MICHAEL HALEY,                  )
COMMISSIONER, ALABAMA           )            (WO)
DEPARTMENT OF CORRECTIONS,      )
et al.,                         )
                                )
      Respondents.              )


OPINION

     In this habeas proceeding bought pursuant to 28 U.S.C.A.

§ 2254, petitioner Randy Turpin Bell challenges his

conviction and death sentence in an Alabama state court for

capital murder.   An evidentiary hearing pursuant to Rule 8

of the Rules Governing § 2254 Cases was held and evidence

was taken on the claims that had not been defaulted or

already denied on the merits.   Bell v. Haley, 2001 WL

1772140 (M.D. Ala. 2001).   Bell now maintains four related

grounds for relief based on Brady v. Maryland, 373 U.S. 83,

83 S. Ct. 1194 (1963), and Giglio v. United States, 405 U.S.
150, 92 S. Ct. 763 (1972). Specifically, Bell asserts these
claims: (1) the State improperly suppressed a pretrial
statement by Joseph C. Austin, Jr.; (2) the State improperly
failed to disclose a deal with Austin for his testimony at
trial; (3) the State failed to correct Austin's perjurious
or misleading testimony; and (4) the State failed to
disclose a deal with Michael Joe Hubbard for his testimony
at Bell's trial. For the reasons that follow, the court
finds that Bell is entitled to relief as to his death
sentence but not as to his conviction.

This opinion will proceed as follows. First, the court
will set forth the procedural background of the case and the
governing legal standard. Then the court will describe the
factual background of the investigation into Bell's trial
and conviction. Next, the court will make factual findings
relevant to Bell's claims. Finally, the court will analyze
Bell's claims in light of its factual findings.

2

## I.   PROCEDURAL BACKGROUND

The procedural history of this case is recounted in the court's prior opinion, <u>Bell v. Haley</u>, 2001 WL 1772140 (M.D. Ala. 2001), and will be simply summarized here.  Bell was convicted on May 5, 1983, of capital murder, namely murder during the commission of robbery in the first degree, for the death of Charles Mims in violation of 1975 Ala. Code § 13A-5-40(a)(2).  The jury recommended by a vote of ten-to-two that Bell be sentenced to die, and the trial court accepted the jury's recommendation.

On direct appeal, the Alabama Court of Criminal Appeals upheld Bell's conviction and death sentence, <u>Bell v. State</u>, 475 So.2d 601 (Ala. Crim. App. 1984), as did the Alabama Supreme Court.  <u>Ex parte Bell</u>, 475 So.2d 609 (Ala. 1985). After the denial of his direct appeal, Bell petitioned the state court for a writ of error coram nobis.  The writ was denied by the trial court, and the denial was affirmed by the Alabama Court of Criminal Appeals.  <u>Bell v. State</u>, 518 So.2d 840 (Ala. Crim. App. 1988).  The Alabama Supreme Court

3

denied certiorari, <u>Bell v. State</u>, No. 87-296 (Ala. 1988), as did the United States Supreme Court.  <u>Bell v. Alabama</u>, 486 U.S. 1036, 108 S. Ct. 2024 (1988).

In 1990, Bell filed two new petitions for collateral relief in state court.  Both petitions were denied by the trial court, and both denials were upheld by the Alabama Court of Criminal Appeals.  <u>Bell v. State</u>, 565 So.2d 1244 (Ala Crim. App. 1990); <u>Bell v. State</u>, 593 So.2d 123 (Ala. Crim. App. 1991).  The Alabama Supreme Court denied review in both cases.

After exhausting his state remedies, Bell filed this suit in federal court on July 7, 1995, pursuant to 28 U.S.C.A. § 2254.  During stage I of the proceedings, the court determined which of Bell's claims could be heard on the merits.  <u>Bell v. Haley</u>, 2000 WL 33682804 (M.D. Ala. 2000).  In stage II the court reached the merits of many of those claims, and set an evidentiary hearing to hear additional evidence on Bell's <u>Brady/Giglio</u> claims.  <u>Bell v.</u>

**4**

<u>Haley</u>, 2001 WL 1772140 (M.D. Ala. 2001).  The court will now
decide the merits of those claims.


## II. LEGAL STANDARD

This court's habeas review of state-court proceedings is
governed by 28 U.S.C.A. § 2254(d).  In its earlier opinions,
the court held that the Anti-Terrorism and Effective Death
Penalty Act of 1996 (AEDPA), which placed significant
restrictions on the availability of habeas corpus relief,
did not apply to this case because it was filed before April
24, 1996, when AEDPA was enacted.  <u>Bell</u>, 2001 WL 1772140,
*2; <u>Bell</u>, 2000 WL 33682804, *2.  This holding was based on
Supreme Court's opinion in <u>Lindh v. Murphy</u>, 521 U.S. 320,
117 S.Ct. 2059 (1997), which held that chapter 153 of AEDPA,
which includes § 2254, the provision at issue in this case,
applied only to cases filed after AEDPA's effective date.

On July 23, 2004, the Eleventh Circuit issued an opinion
in <u>Kelley v. Secretary for Dept. of Corrections</u>, 377 F.3d
1317 (11th Cir. 2004), <u>cert. pet. pending</u>, 73 U.S.L.W. 3540

5

(Mar. 3, 2005) (NO. 04-1196)  The Kelley court stated that a district court was wrong to assume that AEDPA did not apply retroactively to a habeas petition filed in a capital case before AEDPA was passed.  Id. at 1340-1341.  While chapter 153 is nonretroactive, the court said, parts of § 2254 might apply retroactively through AEDPA's chapter 154, which is retroactive and which incorporates some parts of chapter 153 by reference.  Id. at 1339-1340.  Chapter 154 applies only if the State that sentenced the petitioner meets the so-called "opt-in" criteria of 28 U.S.C.A. §§ 2261(b) and (c) by establishing a mechanism for the appointment and payment of competent counsel in State post-conviction hearings for prisoners under capital sentences.  Id.

      In light of this holding, this court asked the parties for additional briefing on the question of whether Alabama has satisfied the opt-in provisions of § 2261(b) and (c) such that AEDPA might apply retroactively to this case.  The State responded in its brief that because "no court has

6

ruled that Alabama has satisfied the opt-in provisions, ...

"AEDPA ... cannot apply retroactively to the instant case."

Thus, § 2254, as it was before it was amended by AEDPA,

governs this case.[1]   Under this standard, the factual

findings of state courts are presumed to be correct unless

one of the eight enumerated exceptions in § 2254(d) applies.[2]

_____

1.   Accordingly, all references herein to § 2254 refer
to the pre-AEDPA version of the statute, unless otherwise
noted.

2.   28 U.S.C.A. § 2254(d), as it applies to this case,
provides as follows:

> "(d) In any proceeding instituted in a
> Federal court by an application for a writ
> of habeas corpus by a person in custody
> pursuant to the judgment of a State court,
> a determination after a hearing on the
> merits of a factual issue, made by a State
> court of competent jurisdiction in a
> proceeding to which the applicant for the
> writ and the State or an officer or agent
> thereof were parties, evidenced by a
> written finding, written opinion, or other
> reliable and adequate written indicia,
> shall be presumed to be correct, unless
> the applicant shall establish or it shall
> otherwise appear, or the respondent shall
> admit—
>
> (1) that the merits of the factual dispute
>                                    (continued...)

7

---

2.   (...continued)
     were not resolved in the State court
     hearing;

     (2) that the factfinding procedure
     employed by the State court was not
     adequate to afford a full and fair
     hearing;

     (3) that the material facts were not
     adequately developed at the State court
     hearing;

     (4) that the State court lacked
     jurisdiction of the subject matter or over
     the person of the applicant in the State
     court proceeding;

     (5) that the applicant was an indigent and
     the State court, in deprivation of his
     constitutional right, failed to appoint
     counsel to represent him in the State
     court proceeding;

     (6) that the applicant did not receive a
     full, fair, and adequate hearing in the
     State court proceeding; or

     (7) that the applicant was otherwise
     denied due process of law in the State
     court proceeding;

     (8) or unless that part of the record of
     the State court proceeding in which the
     determination of such factual issue was
     made, pertinent to a determination of the
                                  (continued...)

8

However, where one of these exceptions does apply, the state court's factfinding is not presumed correct, and the petitioner must establish "the facts necessary to support his claim by only a preponderance of the evidence." <u>Kelley</u>, 377 F.3d at 1335.   Questions of law and mixed questions of

2.   (...continued)
sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous."

28 U.S.C.A. § 2254.

law and fact, in contrast, are subject to de novo review.
See, e.g., Freund v. Butterworth, 165 F.3d 839, 861 (11th
Cir. 1999).  Nonetheless, when a mixed question of law and
fact turns on a fact found by the state court, the finding
of the state court deserves deference.  See, e.g., Arizona
v. Fulminante, 499 U.S. 279, 287, 111 S. Ct. 1246, 1252
(1991).


### III.  FACTUAL BACKGROUND AND TRIAL TESTIMONY

#### A.  Background

Charles Mims, of Clanton in Chilton County, Alabama,
disappeared on December 14, 1981, and has not been heard
from since; his body has never been found; the weapon
allegedly used to kill him has not been found; and no
forensic physical evidence has been found that would reveal
that he is dead or how he died.  Randy Bell, a.k.a. Randy
Cole, was convicted of Mims's murder based mainly on the
testimony of two witnesses:  Michael Joe Hubbard, who
testified that he saw Bell rob and kill Mims and that he

10

himself was un unwilling participant in the murder; and

Joseph C. Austin, Jr., who testified that, on the night of

the murder, Bell told him that he and Hubbard had robbed

Mims and showed him the proceeds of the robbery.  At the

time he testified in the Bell case, Hubbard was represented

by attorney Robert Bowers, Sr. in another, unrelated case.[3]

The primary investigators into the disappearance of

Charles Mims were Benny Mims, an investigator for the

Chilton County Sheriff's Department, and John Perdue, an

agent with the Alabama Bureau of Investigation (ABI).[4]  The

prosecutors on the case were Janice Clardy and William R.

_____

3.  Bowers later became a judge in Chilton County,
Alabama, and served on the bench for 17 years.  However, to
minimize confusion, the court will simply refer to him as
Bowers, rather than as Judge Bowers.

4.   The record suggests that Investigator Mims was
related to Charles Mims.  The court reporter during Bell's
trial was Eloise Mims, who the judge in Bell's trial stated
during jury selection was Investigator Mims's wife.  Trial
transcript, pp. 17-18.  The record contains a handwritten
statement, dated October 7, 2000, by Eloise Mims stating
that Charles Mims was her first cousin.  Petitioner's
exhibit 21.  The court also notes that one of the jurors in
Bell's case was named Mims.  However, when the jurors were
asked if they were related to Charles Mims or Investigator
Mims, none of them responded.  Trial transcript, pp. 5, 16.

Hill, Jr.[5]  Clardy was the Chief Assistant District Attorney of the 19th Judicial District of Alabama, which encompasses Chilton County; Hill was the District Attorney for the neighboring 18th Judicial District in Alabama.

### B.  Trial Testimony

At Bell's trial, Hubbard testified that Bell asked him to call Charles Mims on December 14, 1981, because Bell had a television and some firearms to sell to Mims.  At that time, Hubbard was 18 years old, and Bell was 26 years old. Mims had purchased stolen property from Hubbard in the past. Early in December 1981, Hubbard testified, Mims had refused to buy some stolen goods that Bell had tried to sell him. Hubbard also testified that Bell had commented about the fact that Mims often carried large amounts of money.

Hubbard contacted Charles Mims around dusk on December 14 and arranged a meeting at the West End Washeteria in

---

5.  Janice Clardy's name changed to Janice Clardy Williams and then Janice Clardy Massa.  The court will refer to her as Clardy since that is how she is referred to throughout the record.

Clanton.  Mims was at a grocery store when he received the call from Hubbard.  Helen Smith, the grocery store owner, testified that Mims received a call and then told her he was going to meet the "cowman" 30 minutes later to discuss buying a television and some guns.  Smith said she knew that the "cowman" meant two African-American men who drive a green-and-white Cadillac.  Bell and Hubbard are both African-American, and Bell drove a green-and-white Cadillac. Smith also testified that, before he left the store, Mims took a wad of money out of his wallet, and Smith estimated that he had about $ 600 or $ 700.

Hubbard testified that he and and Bell waited for Mims at the washeteria in Bell's car for about 20 or 25 minutes. Then they went to Bell's house, where Bell took three dollars out of his "piggy bank."  They went to a Shell Station on Highway 31 and bought three dollars worth of gas.

Ray Anthony Pairrett testified that Charles Mims came over to his house at around 6:00 p.m. and watched television for an hour.  When Mims left, he said he was going home but

13

that he would return at 10:00 to watch the news.  Mims never
arrived at his own house, nor did he return to Pairrett's
house later that evening.

A little after 7:00 p.m., Hubbard testified, he and Bell
saw Charles Mims's truck going down the road.  Bell began to
follow Mims's truck and then flashed his headlights at Mims.
Mims stopped, and Hubbard, following Bell's instructions,
told Mims to follow Bell's car.  Mims followed Bell to the
campgrounds on Kincheon Road.

Hubbard testified that, when they arrived at the
campgrounds, Bell stated that the things he had for sale
were behind a building.  When Hubbard turned around, Bell
was pointing a pistol in Mims's face.  Bell instructed
Hubbard to get a rope out of his car and to tie Mims's hands
together.  Hubbard did so; he testified that Bell then
tightened the rope while still holding his pistol in his
hand.

At this point, Hubbard testified, another car drove by
and Bell said that he was worried the driver would recognize

**14**

his car.  Carol Joiner, an acquaintance or ex-girlfriend of
Bell's, testified at trial that she drove by the campgrounds
and saw Bell's green-and-white Cadillac parked next to
Mims's truck.  Later that evening, Joiner passed by again
and saw only Mims's truck there.  When she later asked Bell
about this, she testified, he told her to "shut up" and that
she "knew too much."

Hubbard testified that, after the car drove by, Bell
removed Mims's billfold from Mims's pocket and put it in his
own pocket.  Bell gave Hubbard the keys to his car and told
him to open the trunk, which Hubbard did.  Bell then put
Mims in the trunk.  Bell and Hubbard got into the car, and
Bell drove to an isolated rural area.  Hubbard testified
that Bell still had the pistol in his hand.

When Bell stopped the car, Hubbard testified, Bell gave
Hubbard the keys and told him to open the trunk, and Hubbard
did so.  Bell then put the gun back up to Mims's face and
led Mims into the woods.  Hubbard testified that he then saw
Bell push Mims into a shallow trench and shoot him twice in

15

the head, holding the gun about a foot away from Mims's head.  Hubbard testified that when he saw Bell shoot Mims, he ran back to Bell's car.  He testified that he looked back about three times as he ran, and Mims did not get up again.

Bell had two flat tires as he drove back to town.  He and Hubbard changed the first flat tire, but, when the second tire blew, Bell simply slowed down and kept driving.  Mims's wife and another witness both testified that they saw Bell's car heading back towards town that evening with a flat tire at about 7:45.  Hubbard testified that Bell dropped him off at the washeteria and told him he was going to go get a new tire.

Joseph C. Austin, Jr., testified that at around 8:30 p.m., when he was watching the Monday night football game, Bell stopped by Austin's house, and Bell had a flat tire.  Austin testified that Bell told him that Hubbard had called Mims to offer to sell him stolen goods and that, when Hubbard and Bell met Mims, they robbed him instead of selling him the goods.  Austin also testified that Bell

16

showed him some money that he said he had gotten during the robbery. Austin testified that Bell then asked him where he could buy a tire; Austin said he told Bell where he could buy a tire, walked Bell to a friend's house, and saw Bell get into the friend's van and drive away to get a tire.[6]

William Aubrey Wilson, a Chilton County Deputy Sheriff, testified that he pulled Bell over in his green-and-white Cadillac at 10:17 p.m. on December 14 because he was driving slowly. Bell was about half a mile from Clanton on Highway 22, heading back towards town. Bell told Wilson that he was driving slowly because he was looking for a hubcap he had lost earlier that night when he'd gotten a flat. Wilson confirmed that Bell's car was missing a hubcap. Wilson said that someone else was in Bell's car with him, but it was not Hubbard.

Hubbard testified that he spoke with Bell on several occasions after the murder. Bell warned Hubbard not to speak to the police, and later told him that he, Bell, had

---

6. Austin's friend did not testify at the trial.

17

moved Mims's body using his car and disposed of it by pouring acid on it.

During the trial, evidence was entered that Bell applied for and obtained new license plates on December 15, 1981. Bell's car was later found at a used car dealership in Atlanta, Georgia; the trunk was wet and, according to a Georgia Bureau of Investigation Agent, it smelled strongly of detergent.  Bottles of cleaning agents and an open box of .25 caliber ammunition were found in the trunk.  No forensic evidence, such as blood, hair, fingerprints, or spent shell casings were found in Bell's car.

### IV.  Factual Findings

#### A.  Joseph C. Austin, Jr.

##### 1.  Austin's January 12 statement

On January 12, 1983, Austin gave a sworn statement to ABI Agent Perdue at the Chilton County Sheriff's Department. The statement conflicts with Austin's later trial testimony

and with Hubbard's account of how Charles Mims died.  The

January 12 statement reads in part:

> "Several days after Charles Mims
> disappeared Randy Cole [Bell] told me that
> he and Michael Joe Hubbard had met Charles
> Mims to sell him some hot stuff.  After
> meeting him they decided to rob him.
> Randy said Michael Joe had Randy's gun and
> Randy made him shoot him.  Since Randy
> thought Charles would have them killed for
> robbing him.  Randy said Mims was not dead
> so he got the pistol from Michael Joe and
> shot Mims again.
>
> "When Michael Joe Hubbard was arrested the
> weekend after Mims disappeared Randy Cole
> told me that he should knock Michael Joe
> off since Michael Joe could fuck him up if
> Michael Joe told about Mims."[7]

Although Bell's counsel requested that the State turn over

all exculpatory materials before the trial, the State did

not turn over Austin's pretrial statement.

In his deposition, ABI Agent Perdue confirmed that the

January 12 statement was written in his handwriting,

although he said that he did not remember taking it until he

---

7. Petitioner's exhibit 3.  "Randy Cole" was an alias
of Bell's.

was reminded of it at the deposition.[8]  As a matter of course, Perdue said, he would have turned over the statement to the prosecutors in the case; it should have been part of his investigative file, which he would have provided to the district attorney.[9]  However, Perdue does not specifically remember turning over the Austin statement to the prosecutors.[10]  Both prosecutors in the Bell case, Clardy and Hill, say they do not remember seeing, or being aware of, the January 12 statement at the time of Bell's trial.[11]  However, the statement was in the files of the District Attorney's Office for the 19th Judicial District in 1996;

_____

8.  Deposition of John A. Perdue, taken July 11, 2002 [hereinafter Perdue 2002 deposition], Petitioner's exhibit 79, pp. 16-17.

9.  Id. at 32; Deposition of John A. Perdue, taken Nov. 18, 1996 [hereinafter Perdue 1996 deposition], Petitioner's exhibit 63, pp. 86-87.

10.  Perdue 2002 deposition, Petitioner's exhibit 79, p. 32.

11.  Deposition of William R. Hill, Jr., taken July 11, 2002 [hereinafter Hill deposition], Petitioner's exhibit 82, pp. 36-37; Deposition of Janice Clardy Massa, taken July 11, 2002 [hereinafter Clardy 2002 deposition], Petitioner's exhibit 80, p. 65.

Clardy was the District Attorney for the 19th Judicial District at the time. The District Attorney's Office disclosed the statement to Bell's counsel in April 1996, only after service of a subpoena on the Chilton County District Attorney's office in November 1995. Because it was not disclosed until after all of the state-court proceedings had concluded, the state courts never had a chance to consider this evidence. This court previously found that Bell has shown cause and prejudice for his failure to present this evidence to state court.

### 2. State's failure to correct Austin's testimony at trial

At trial, Austin did not testify that Bell told him that Hubbard shot Charles Mims first, as he had said in his January 12 statement; in fact, Austin did not testify that Bell told him anything about Mims's death. He did testify, consistent with the pretrial statement, that Bell told him that Hubbard had called Mims to offer to sell him some "hot

stuff" and that when Bell and Hubbard met Mims they decided to rob him instead.

There were other differences between Austin's January 12 statement and his trial testimony.  At trial, Austin said that Bell had shown him some money that he had taken from Charles Mims; this information was not in the pretrial statement.  At trial, Austin said that the conversation with Bell occurred on December 14, the night Mims disappeared, and that Bell came to his house on that night while Austin was watching the Monday night football game, and Bell had a flat tire.  In the pretrial statement, Austin placed the conversation with Bell "several days" after Mims disappeared, and did not mention anything about a flat tire.

When Bell's attorney cross-examined Austin at trial, he asked him, "Did Randy [Bell] tell you that Michael Joe [Hubbard] did anything on that occasion?"  Austin replied, "No--no, not on that occasion he did not tell me."[12]  Austin

---

12.  Trial transcript, p. 279.

did not say that he had had more than one conversation with

Bell about Mims.  The prosecution did not re-direct.


### 3.  Alleged deal for Austin's testimony

The question of whether a deal or agreement between the

State and a witness existed is one of fact.  <u>Tarver v.</u>

<u>Hopper</u>, 169 F.3d 710, 717 (11th Cir. 1999).  Bell alleges

that the State had a deal with Austin that he would receive

leniency in the charges pending against him if he testified

for the State in Bell's trial.  The evidence as to the

alleged deal remains murky, so the court will review the

evidence in some detail.[13]

_____

13.  In their brief, the respondents address separately
the questions of whether the State (1) promised leniency in
the Chilton County case (discussed later), (2) promised
leniency in the Tuscaloosa County case (discussed later), or
(3) threatened Austin with harsher treatment in the
Tuscaloosa County case (discussed later).  In contrast, in
his brief, Bell addresses all three issues together, at
times conflating the Tuscaloosa and Chilton county charges.

In setting forth the evidence, the court will address
the three related allegations together, while being clear
about which charge it is discussing.  It is appropriate to
discuss all of the allegations together because it is
(continued...)

In May 1982, ABI Agent Perdue, Investigator Mims, Assistant District Attorney Clardy, and two other police officers met to discuss the ongoing investigation into Charles Mims's disappearance. Perdue wrote a memo after this meeting; the memo reveals that the investigators and Clardy thought that Austin might have information on Charles Mims's disappearance, but that they thought he was more likely to cooperate if there were charges pending against him which they could use as leverage. Perdue's memo reads in relevant part as follows:

> "The consensus opinion of the persons present was that a concentrated effort on narcotics dealers in West End (Clanton) was needed to determine if anyone other than Randy [Bell] knew the location of [Charles] Mims' body. The primary target for this assignment would be Joe Austin,

---

13. (...continued)
possible that there existed an informal "deal" or agreement whose parameters were not explicit; the State could have promised Austin leniency in the charges pending against him without specifying exactly what would happen with each charge. Similarly, the allegations that the State agreed to help Austin with charges if he cooperated and that the prosecutors threatened Austin with an enhanced sentence if he did not cooperate are related, so it makes sense to consider all of the evidence together.

Jr., AKA "PICK" who is an associate of
[Bell] and is apparently heavily involved
in cocaine and marijuana sales.

                    ...

"Upon   completion   of   the   undercover
operation it is hoped that "PICK" may
provide   evidence   against   [Bell]   in
connection  with  the  disappearance  of
Charles Mims if he ("PICK") is faced with
narcotics   charges   stemming   from   the
undercover operation."[14]

It does not appear that Austin was ever arrested on
narcotics charges.  However, he was arrested for burglary
and theft of property in Chilton County on August 24, 1982.
He posted a $ 5,000 bond the same day.[15]

Although   the   record   does   not   contain   complete
information on the matter, it is undisputed that, sometime
before the Bell trial, Austin was also charged with robbery
in Tuscaloosa County.

The evidentiary record reveals that Austin was arrested
again in Chilton County, this time on a charge of receiving

_____

14.  Perdue memo to file, Petitioner's exhibit 4.

15.  Case Action Summary, records of Chilton County case
number CC-83-12, Petitioner's exhibit 51.

25

stolen property on January 12, 1983.  The Chilton County "Jailer's Record" shows that Austin was arrested by "C. Wright" at 5:00 p.m.[16]  At  5:20 p.m. that same day, Austin gave his first pretrial statement, discussed above, in which he stated that Bell told him that Hubbard shot Charles Mims first.  The investigators who took the statement were Agent Perdue and Charles Wright of the Chilton County Sheriff's Department.  Austin posted bond on the receiving-stolen-property charge on the same day, January 12, 1983.

At some point between January and May of 1983, Austin gave another statement to the Alabama Bureau of Investigation that differed from the January 12 statement. The ABI statement was consistent with the testimony Austin would give at Bell's trial.[17]

_____

16.  Jailor's Record, Petitioner's exhibit 51.

17.  The record does not appear to contain a copy of the ABI report.  The court's description of it as consistent with Austin's trial testimony is based on District Attorney Hill's testimony at the evidentiary hearing that the ABI report containing Austin's statement was consistent with Austin's trial testimony.  Transcript of August 29, 2002, evidentiary hearing (hereinafter "hearing transcript"), pp.
(continued...)

Austin was set to go to trial on all of the Chilton County charges (the burglary and theft-of-property charges, and the receiving-stolen-property charge) on May 2, 1983, the same day that Bell's capital-murder trial began.[18]  As Assistant District Attorney Clardy explained, in the 19th Judicial Circuit at that time only one week of criminal jury trials was held in each county in the spring, and one week in the fall.  In the spring of 1983, none of the trials other than Bell's actually took place, since Bell's capital-murder trial took longer than most trials.[19]  Thus, Austin was not tried on the Chilton County charges in May 1983.

_____

17.  (...continued)
17-18.

18.  Circuit Court of Chilton County criminal division jury trial schedule for May 2-5, 1983, Petitioner's exhibit 5 (showing Austin was set for trial on Case No. CC 93-12, "Theft of property, Burglary" and Case No. CC 83-100, "Rec. stolen property," on May 2, 1983).

19.  Clardy 2002 deposition, Petitioner's exhibit 80, pp. 54-55.

27

The receiving-stolen-property charge was dropped (or "nol-prossed") on October 30, 1984.[20] Austin was rescheduled for trial on the burglary and theft charges on March 25, 1985, but he did not appear.[21] He had since left Alabama and gone to Oregon; he stated in his deposition that this was in part to escape charges pending against him in Tuscaloosa County.[22] A final judgment forfeiting his bond in the Chilton County burglary and theft case was entered on December 10, 1985.[23] In April 1986, Clardy moved to nol-press the Chilton County burglary and theft charges and to set aside the final judgment of forfeiture as to the bond

---

20. Case Action Summary, records of Chilton County Case No. CC-83-100, Petitioner's exhibit 51.

21. Notice of Failure to Appeal and Conditional Bond Forfeiture, records of Chilton County case number CC-83-12.50, Petitioner's exhibit 51.

22. Deposition of Joseph C. Austin, Jr., taken July 9, 2002 [hereinafter Austin deposition], Petitioner's exhibit 73, pp. at 17, 75.

23. Final Judgment, records of Chilton County case number CC-83-12.50, Petitioner's exhibit 51.

28

Austin had posted; this motion was granted on April 25, 1986.[24]

This court does not have complete records about the robbery charges in Tuscaloosa County.  However, it is undisputed that days after Bell was convicted of capital murder, ABI Agent Perdue sent a letter to Charles Freeman, District Attorney of Tuscaloosa County, asking Freeman to exercise leniency or drop the charges pending against Austin because of Austin's testimony in Bell's trial.  The letter stated:

> "Joe Austin, Jr. ... of Clanton is presently awaiting trial in your county on a charge of Theft in the Second Degree. It is my understanding the case is set for May 30, 1983. ...
>
> "On December 14, 1981 Charles Mims disappeared from Clanton.  Information provided by Austin during the investigation and his testimony during a recent trial was crucial to the successful prosecution of Randy Turpin Bell, Alias Randy Cole, for Capital Murder in connection with Mims' disappearance. [Bell] has been a "Thorn in the side" of

---

24.  Motion and Order on Motion, id.

29

> Chilton County Authorities for over ten
> years.
>
> "Additionally Austin has provided State
> and Federal Authorities with information
> concerning the August 5, 1982 robbery of
> the Bank of Maplesville.  Austin has
> appeared before a Federal Grand Jury and
> is scheduled to testify at the Federal
> Bank Robbery trial of the three defendants
> on May 23, 1983.
>
> "Austin has asked the writer to contact
> you regarding his pending case in your
> county.  The writer requests that Austin's
> assistance to Law Enforcement in two major
> felony cases be considered when Austin's
> case comes to trial.  Any consideration
> that you would give towards allowing
> Austin to plead to a lesser offense which
> would enable him to retain his freedom,
> would be appreciated."[25]

The primary evidence that Bell presents to show that

Austin had a deal with the State is the testimony of Austin

himself.  Austin contends that Investigator Mims and Agent

Perdue both told him that the Chilton County charges against

him would be dropped if he testified in Bell's trial.

Austin signed a statement on August 1, 2000, which states in

part:

---

25.  May 9, 1983 letter, Petitioner's exhibit 6.

"3.   On or about August 1982, I was arrested on burglary charges in Chilton County, Alabama.

"4.   Several months after that, between August 1982 and January 1983, Investigators Benny Mims and John Perdue talked to me about the disappearance of Charlie Mims.   They told me that "if I didn't testify in the trial of Randy Bell, they would put me back in the penitentiary and my ass would never see daylight."

                    . . .

"6.   Before Randy Bell's trial began, Investigators Benny Mims and John Perdue prepared me to testify at the trial.   They carefully went over my testimony with me.

"7.   I remember that both Investigators, Benny Mims and John Perdue, at different times told me that if I testified at Randy Bell's trial and cooperated with them that I would not have to face the burglary charges against me.   I was scheduled by the court for a hearing on these burglary charges at the same or about the same time as Randy Bell's trial.   Investigators Benny Mims and John Perdue told me that the burglary charges against me would be dropped if I testified at Randy Bell's trial."[26]

---

26.  August 2000 statement of Joseph C. Austin, Jr., Petitioner's exhibit 52.

On July 9, 2002, the parties took Austin's videotaped deposition in an Oregon prison, where Austin was incarcerated.  In this deposition, Austin confirmed what he had said in the August 2000 sworn statement.  Specifically, Austin stated that he remembers Investigator Mims or Agent Perdue telling him they would "put him back in the penitentiary" and that his "ass would never see daylight" if he did not testify about Charles Mims's disappearance.[27] Austin also confirmed that Investigator Mims and Agent Perdue told him that the Chilton County burglary charges would be dropped if he testified at Bell's trial.[28]

In his deposition, Austin was also asked about the Tuscaloosa charges pending against him.  Austin's testimony on this matter was inconsistent.  At first he did not remember that there were charges pending against him in

---

27.  Austin deposition, Petitioner's exhibit 73, pp. 10, 55.

28.  Id. at 15.

Tuscaloosa at the time of Bell's trial.[29]   When he was
reminded about the charges, Austin insisted that they had
nothing to do with the Bell case.[30]   When shown the letter
that Agent Perdue wrote to the District Attorney of
Tuscaloosa after Bell's trial requesting that the Tuscaloosa
charges be reduced, Austin stated that the letter had
nothing to do with the Bell case and that he did not know
about the letter until Bell's attorney showed it to him.[31]
He explained that he left Alabama and went to Oregon after
testifying at Bell's trial in part to escape the Tuscaloosa
charges, which were still pending against him.   Austin
stated that he still owes money to the people who helped him
post bail in the Tuscaloosa case, because he jumped bail
when he left Alabama.[32]   However, later in the deposition,
Austin agreed that part of his agreement with Agent Perdue

---

29.  Id. at 14.

30.  Id. at 16-17.

31.  Id. at 17.

32.  Id. at 75.

33

and Investigator Mims was that they would help him with the pending Tuscaloosa charges in exchange for his cooperation.[33]

Austin's deposition testimony about his testimony at Bell's trial was also confused, but sheds light on his credibility, memory, and motivations.  At the beginning of his deposition, Austin incorrectly remembered the substance of his testimony in the Bell trial: he stated that he had testified _for_ Bell by testifying that Bell had said Hubbard shot Charles Mims first.[34]  Later, after he was shown a transcript of his trial testimony, Austin said that he had originally intended to help Bell by testifying that Hubbard shot Mims first, but that "somehow it got twisted around." Austin seemed to say that his story was "twisted around" due to the State's promise that the charges against him would be dropped if he testified.  Austin stated as follows:

> "I can say this, is that, you know, Randy
> [Bell] was a friend of mine.  You know.
> Plus he was in my family, man.  And I
> thought that--what I thought was the

_____

33.  Id. at 71.

34.  Id. at 11, 22.

**34**

honorable thing to do was that--to try to
free Randy on what he had told me, you
know.  And then it got twisted around, you
know, on--you know, somehow it got twisted
around, man.

                    . . .

"When I told these people, man, what Randy
had told me, you know, and I was trying to
free Randy by the charges that I had,
that, you know, that they would dismiss
the charges if I testified. You know what
I'm saying?   Which I thought I was
testifying anyway, when I told--when I
told them that Randy said that Michael Joe
[Hubbard] had shot Mims.  And then it got
twisted around, so I don't know."[35]

Austin then had the following exchange with Bell's attorney:

"Bell's attorney:  In addition to trying
to help Randy Bell, you were also trying
to help yourself?

"Austin: Naturally.  Naturally.

"Bell's attorney:  And that--and that was
because  you  had  an  agreement  with
[Investigator] Mims and [Agent] Perdue and
with Prosecutor Hill before you testified
that you would get lenient treatment?

"Austin: Yes, I did.  Yes, I did. Yes."[36]

_____

35.  Id. at 42-43.

36.  Id. at 43.

The court views Austin's initial failure to remember that he testified against Bell as evidence that Austin's memory is very poor, and also as an instance of the human tendency to remember things in a way that is flattering to one's self.  Austin's memory was shaped by his desire to think that he did "the honorable thing" by testifying that Bell told him Hubbard shot Charles Mims first.  In fact, of course, he did not testify in this way.  One explanation, and the one Bell urges the court to adopt, is that Austin changed his story because he had a deal with the prosecution that the charges pending against him would be dropped if he testified against Bell.

As is demonstrated by Austin's confusion over the Tuscaloosa County charges and his trial testimony, Austin's memory as to key events surrounding Charles Mims's disappearance and Bell's trial is highly unreliable.  Austin admitted in his deposition that his memory is "kind of shot" due to the passage of nearly 20 years since Bell's trial, and due to his nearly daily use of crack cocaine in the

intervening period.[37]  It cannot be disputed that Austin's memory as to the events of the early 1980s is incomplete and incorrect on some points, including important points. However, the court notes that, while Austin's recollection about certain topics is poor, in his deposition he showed a willingness to admit when he could not remember something. In weighing the evidence, the court will certainly keep in mind the weakness of Austin's memory.

Apart from Austin's deposition, the main evidence that Bell presents to show a deal with Austin is the testimony of District Attorney Hill, who came from a neighboring judicial district to help with the Bell prosecution a few weeks before the trial began.  On September 13, 2000, Hill completed an affidavit in which he stated: "I also know that Joseph C. Austin, Jr., otherwise known as 'Pick,' testified against Randy Bell.  At the time, Pick had pending charges against him in Tuscaloosa, Alabama.  The government agreed to help lessen his sentence in exchange for testifying

_____

37.  Id. at 37, 61.

against Randy Bell."[38]   In its 2001 opinion, this court
relied heavily on Hill's seemingly unequivocal statement in
concluding that there was "significant evidence" that there
was a deal for Austin's testimony.  Bell, 2001 WL 1772140,
*27.

However, in a later deposition and in the evidentiary
hearing held in this court in August 2002, District Attorney
Hill clarified his assertion that the State had a deal with
Austin for his testimony.  Hill stated that he does not have
"a distinct, independent recollection" that the government
agreed to help reduce Austin's sentence in exchange for his
testimony, but that it was his "assumption and
understanding" that this was the case.[39]  Hill's assumption
was based on his observations of Austin's demeanor, his
belief that Austin would not cooperate with law-enforcement

---

38.  Hill affidavit, Petitioner's exhibit 19, ¶ 12.

39.  Hill deposition, Petitioner's exhibit 82, p. 28;
see also hearing transcript, p. 24.

officials "unless there was some benefit for him,"[40] and the fact that, before he met with Austin the first time, someone had told him that Austin had charges pending against him in Tuscaloosa.  Hill stated that "obviously the cases in Tuscaloosa had an importance or they would not have been brought to my attention."[41]

While Hill's assumption that there must have been a deal with Austin may be consistent with his long experience as a district attorney, even an informed assumption is not evidence.[42]  Thus, Hill's testimony does not provide independent evidence to show that there was a deal for Austin's testimony.

---

40.  Hearing transcript, p. 24.

41.  Hill deposition, Petitioner's exhibit 82, p. 28.

42.  This court noted as much in its 2001 opinion when it stated that the statement of James Earl Johnson, who was the sheriff of Chilton County at the time of the Bell trial, that it was his "belief" that the District Attorney's office gave Hubbard immunity for testifying against Bell, was not independent evidence that a deal existed.  Bell, 2001 WL 1772140, *30.

However, District Attorney Hill's testimony does present evidence that he himself threatened Austin with the possibility of an increased sentence in the Tuscaloosa case under a new "repeat offender" law, which was known colloquially as the "bitch" law, in order to convince him to cooperate with prosecutors in the Bell case.[43]   Hill

---

43.  This court is considering the evidence that Hill threatened Austin even though that evidence was not presented to the State courts.

The respondents argue that Bell has waived any claim based on this alleged threat because he did not raise the claim in state court or in his initial petition in this court.   The Eleventh Circuit Court of Appeals has stated that "the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief."   Kelley, 377 F.3d at 1344.   "For example, habeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state court."   Id.

However, that rule is not applicable here.   In its earlier opinion, this court ruled not only that Bell had shown cause for his failure to present some of the evidence as to his claim that the State suppressed the fact it had a deal with Austin, the court ruled that Bell had shown cause for his failure to raise this claim at all.   Bell, 2000 WL 33682804, *11 (discussing new evidence that the State "pressur[ed] [Austin] to produce testimony inculpating the
(continued...)

_____

43.  (...continued)
petitioner" and finding cause and prejudice for Bell's
failure to bring this claim in state court).  The court then
held an evidentiary hearing and now considers all of the
evidence relevant to the claim, as is the appropriate
procedure.  See Haber v. Wainwright, 756 F.2d 1520, 1524
(11th Cir. 1985) (district court should consider additional
evidence as to claimed Giglio violation in order to fully
evaluate claim).  The court considers the evidence that
Distrcit Attorney Hill threatened Austin to be part of the
same Brady claim as the evidence that the State had a deal
or agreement with Austin, since both go to whether the State
used the pending charges as leverage to encourage or
influence him to testify.

Further, even if Bell did have to show cause and
prejudice as to the evidence that Hill threatened Austin,
the court finds that Bell has shown such cause and
prejudice.  The State never disclosed that any of its agents
threatened Austin with harsher treatment if he did not
testify until Hill admitted that fact long after the state-
court proceedings had concluded, and in fact after Bell had
already filed his habeas petition in this court.  Because of
the State's consistent denials that it had done anything to
influence Austin's testimony, Bell could not have discovered
the evidence about Hill's threat until Hill disclosed what
he had done.  As the Eleventh Circuit has said, "This court
is unwilling to hold ...
that, if the prosecutor failed to produce evidence which was
required to be produced under Brady and which failure was
unknown to defendant's counsel, the claim is procedurally
barred because defense counsel did not ferret out the
violation.  Such a ruling would reward the wrongdoer because
he was not timely found out."  Julius v. Jones, 875 F.2d
1520, 1525 (11th Cir. 1989).  Thus, Bell has shown cause for
not presenting this evidence to the state courts.  Bell's
                                           (continued...)

testified that, before the Bell trial, he drove to the
Chilton County Courthouse to help prepare Austin to testify.
Assistant District Attorney Clardy was "talking to Mr.
Austin about his testimony," but Hill observed that Austin
was "not looking at the interviewer, and he kept saying he
wasn't sure he remembered, his memory wasn't real good.  He
seemed to be real fuzzy on details."  Hill intervened and,
his words were:

> "I said Pick look at me when I talk to you
> which got his attention, and then you know
> what the bitch law is, which was a slang
> for Habitual Offender Act which was
> recently passed in Alabama.  I said
> basically you're wasting my time and
> unless you can start remembering what you
> said before, I'm fixing to go to
> Tuscaloosa and talk to my good friend
> Charlie Freeman and we're going to discuss
> the bitch law on you. ...
>
> "I was trying to impress upon him that if
> he didn't testify and be a little more
> forthcoming, that I was going to see to it
> that Mr. Freeman knew that he had not

_____

    43.  (...continued)
case was also prejudiced by the withholding of this
information, as is explained in detail later in this
opinion.

cooperated with us in this investigation.
...

"[H]is reaction was that he suddenly his
memory became very clear and I went over
his testimony with him and I was following
it based on the A.B.I. file and suddenly
he had a rather distinct recollection that
was exactly what was in the A.B.I.
statement."[44]

Again, the ABI statement that Hill refers to is not
Austin's January 12 statement, but the later statement which
did not contain the information that Bell had said Hubbard
had shot Charles Mims first.  Austin confirmed that he
remembered Hill's threat to him.[45]

The court explicitly finds District Attorney Hill to be
credible.  The court does not find any reason to doubt his
testimony.  By admitting that he made the threat to Austin,
Hill shows a willingness to admit to engaging in conduct
that reflects poorly on him; this reflects well on his

_____

44. Hearing  transcript,  p.  16;  see  also  Hill
deposition, Petitioner's exhibit 82, p. 20; supplemental
affidavit of William R. Hill, Jr., Petitioner's exhibit 72,
¶ 4.

45.  Austin deposition, Petitioner's exhibit 73, p. 23.

candor.   Further,  the  State  concedes  that  Hill  made  the
statements  about  the  "bitch"  law  to  Austin,  although  it
characterizes  the  statements  as  a  "warning"  rather  than  a
threat.[46]

The  respondents  rebut  Bell's  allegaton  that  the  State
had  a  deal  with  Austin  by  presenting  the  testimony  of
Assistant  District  Attorney  Clardy,  Investigator  Mims,  and
Agent Perdue.  Both Clardy and Investigator Mims stated that
they  did  not  make  any  deals  or  agree  to  arrange  for  any
leniency  with  Austin  in  exchange  for  his  testimony  or
cooperation   in   the   Bell   trial.[47]    Investigator   Mims
specifically denied Austin's allegations that he told Austin
he would not have to face the burglary charges against him
if  he  testified,[48]  and  that  he  would  put  Austin  in  the

_____

46.  Brief of respondent on Brady/Giglio issues, filed
Aug. 16, 2002 (Doc. no. 143), p. 13 n.5.

47.  Clardy 2002 deposition, Petitioner's exhibit 80, p.
76; Benny Mims deposition, taken July 11, 2002 [hereinafter
Benny Mims 2002 deposition], Petitioner's exhibit 78, pp.
32, 34, 80, 82, 83.

48.  Benny Mims 2002 deposition, Petitioner's exhibit
(continued...)

**44**

penitentiary and his "ass would never see daylight" if he did not testify.[49]  Investigator Mims further stated that he did not have the authority to make any deals with Austin.[50] Clardy and Investigator Mims also both stated that they did not remember Hill's threat about the "bitch law,"[51] although Hill stated that he specifically remembered Clardy and Investigator Mims being in the room at the time he made that statement.[52]

When asked why she moved to have the Chilton County charges against Austin nol-prossed three years after the Bell case, Clardy stated that she did not remember.[53]

_____

48.  (...continued)
78, p. 91.

49.  Id. at 90.

50.  Id. at 34.

51.  Clardy 2002 deposition, Petitioner's exhibit 80, p. 83; Benny Mims 2002 deposition, Petitioner's exhibit 78, p. 41.

52.  Hill deposition, Petitioner's exhibit 82, p. 18.

53.  Clardy deposition, Petitioner's exhibit 80, p. 74.

ABI Agent Perdue testified somewhat more ambivalently about whether there was a deal with Austin.  Perdue stated that he did not remember there being any agreement, but also stated he could not "tell you absolutely that there was not something said that could have been misinterpreted by him or there could have been something said that indicated otherwise."[54]  Perdue stated that Austin first volunteered information after he was arrested on the Chilton County charges.[55]  When asked how Austin became a witness, Perdue replied that Austin "volunteered information after he was arrested on an unrelated--totally unrelated case.  Joe Austin, Junior, kind of fell into our lap so to speak.  You know, there was just out of the clear blue on that receiving and concealing stolen property charge."[56]

---

54.  Perdue 2002 deposition, Petitioner's exhibit 79, p. 48.

55.  Perdue 1996 deposition, Petitioner's exhibit 63, p. 63.

56.  Id. at 63.

46

Agent Perdue remembers discussing the Chilton County charges with Austin before Bell's trial.  Perdue stated in 1996 that he "can vaguely remember him talking to me about problems and me telling him we will discuss that later," and agreed that Austin "probably" let it be known that he would seek Perdue's assistance after the trial.[57]  In Perdue's 2002 deposition, Bell's attorney asked, "Do you remember him asking you in any way to help him out with those charges if he cooperated in the Randy Bell case?"  Perdue answered that Austin "made a comment something that he always held something back in case he ever needed it."  Perdue further stated that he told Austin to tell the truth, and that "after that, if he had any questions about any cases, that they could be discussed at that time.  But I couldn't promise him anything.  That wasn't up to me."[58]

Agent Perdue confirmed that after Bell was convicted he wrote a letter to Tuscaloosa District Attorney Charles

_____

57.  Id. at 68.

58.  Perdue 2002 deposition, Petitioner's exhibit 79, pp. 42-43.

47

Freeman, asking him to reduce the charges against Austin because of his "crucial" testimony in the Bell trial and his assistance to the government in another case.[59]   In a deposition he gave in 1996, Perdue stated that Austin asked for his help with the Tuscaloosa charges after Bell's trial was over.[60]   In a deposition he gave in 2002, Perdue stated that he wrote the letter at Austin's request, and that he "presume[s]" that Austin asked him to write it after Bell's trial.[61]

Based on a careful examination and consideration of all the evidence before it, the court finds that Bell has not proved by a preponderance of the evidence that the State had an agreement with Austin before he testified that he would receive leniency in any other case in exchange for his testimony.   While Bell has presented a fairly good

---

59. Id. at 46.

60. Perdue 1996 deposition, Petitioner's exhibit 63, pp. 64, 67, 68.

61. Perdue 2002 deposition, Petitioner's exhibit 79, p. 90.

48

circumstantial case that the State may have offered Austin some consideration for his favorable testimony, some of the evidence is not consistent with this explanation. Specifically, the timing of Agent Perdue's letter to the Tuscaloosa District Attorney might suggest that the State had agreed to help Austin with the Tuscaloosa County charges against him in exchange for his testimony, but Austin stated repeatedly that the Tuscaloosa County charges were not related to the Bell case.   Indeed, Austin stated that he fled Alabama in part to escape those charges; this is strong evidence that he did not expect them to be dismissed.   Also, the burglary and theft charges in Chilton County were not dismissed until several years after the Bell trial; this weakens the inference that their dismissal was a result of Austin's testimony.

Austin is the only witness who offered direct testimony that there was an agreement before Bell's trial.   He stated that Investigator Mims and Agent Perdue told him that the Chilton County charges against him would be dropped if he

49

testified.  However, both Investigator Mims and Agent Perdue denied that they told Austin this.  They both explained that they would not make such a promise because it was beyond their power to do so.  As noted above, while the court does not entirely discount Austin's testimony, and although he did state consistently in his deposition that he was offered leniency in exchange for his testimony, his memory is particularly unreliable due to his years of drug use.  As will be discussed later, the court finds it likely that Austin got the impression that he would be treated more leniently if he testified for the State; however, Bell has not proven by a preponderance of the evidence that there was any actual agreement that this would happen.

Further, while the explanation that the State made a deal with Austin before Bell's trial is one plausible explanation for the evidence described previsously, other explanations would also be consistent with the evidence. For instance, Austin could have simply assumed that he would be treated more favorably if he testified for the State.

However, finding that the State did not make an explicit deal with Austin before Bell's trial does not end the court's inquiry.  The court finds that Bell has shown by a preponderance of the evidence that Agent Perdue did discuss Austin's pending charges with him before the trial, and told him that if he had any questions about charges pending against him, they could discuss the matter later.  Further, the court finds that Perdue expected Austin to ask him for help with the pending charges after the trial.  Perdue testified that this was the case, and his letter to the Tuscaloosa District Attorney days after the trial shows that Austin did ask for help and that Perdue obliged.

The court also finds that, while preparing Austin for trial, District Attorney Hill threatened Austin that, if he did not start remembering things according to his written ABI statement, Hill would speak with the Tuscaloosa District Attorney about Austin and the newly-enacted Habitual Offender Law ("the bitch law").  As Hill testified, immediately after he made this threat, Austin began to

remember "exactly" what was in the ABI report.  He then went on to testify at Bell's trial consistent with that report.

### B.  Michael Joe Hubbard

In this court's 2001 order, the court stated that Bell had introduced new evidence that the State may have had a deal with Hubbard.  Bell introduced two letters that Hubbard wrote in 1993, which were "strong," although not "conclusive," evidence that such a deal existed.  The court held an evidentiary hearing in part to "weigh and probe the weight of Hubbard's letter, and Hubbard's own credibility regarding its contents, before denying or granting relief on this claim."  <u>Bell</u>, 2001 WL 1772140, *31.  As is the case with Austin, the question of whether the State had a deal with Hubbard is not clear, so the court will review the evidence in detail.

On December 18, 1981, four days after Charles Mims disappeared, Investigator Mims brought Hubbard, who was then

18 years old, into the Chilton County Sheriff's Department
to interview him about Charles Mims's disappearance.  At
that time, Hubbard stated that he had seen Bell on December
14, but that he had not spoken to him or gotten into his
car.  Hubbard also denied making any phone calls to Charles
Mims on December 14.[62]  The Sheriff's Department administered
a polygraph test, and based on the results of the test the
polygraphist stated in a memo that he believed that Hubbard
had actually seen Charles Mims on December 14, that he knew
where Charles Mims was located, and that he had been
"involved in taking Charles somewhere Monday night."
However, the polygraphist stated that the polygraph results

---

        62.  This December 18 statement to the police was not
disclosed to the defense.  Bell sought habeas relief based
in part on the State's failure to disclose this statement.
This court denied relief on this ground, finding that the
claim was procedurally defaulted and that the default could
not be excused because Bell had not shown prejudice
resulting from it.  Bell, 2000 WL 33682804, *5.  This was
based in part on the fact that Hubbard did admit at Bell's
trial that he initially lied to the police about his
knowledge of Charles Mims's disappearance.

"do not indicate that [Hubbard] was involved in a fight with Charles Mims last Monday night."[63]

The next day, December 19, 1981, Hubbard was arrested for robbing one Sam Malachi.  At Hubbard's initial appearance in this case on December 21, attorney Robert L. Bowers, Sr. was appointed to represent him.[64]  Hubbard was charged with first degree robbery.

On March 3, 1982, while he was still in jail on the Malachi case, Hubbard told investigators that Bell had shot and killed Charles Mims with a .25 caliber pistol during a robbery and that he, Hubbard, was an unwilling participant.[65] On the same day, Hubbard, accompanied by Bowers, showed investigators the location where he said the crime had occurred.  The investigators searched the area, but did not

---

63.  Memo on polygraph test, Petitioner's exhibit 1.

64.  Case action summary, records of Chilton County case number CC-82-23, Petitioner's exhibit 47.

65.  Memo from Corporal John Perdue to captain R.G. Beasley, dated May 27, 1983, Petitioner's exhibit 7.

find any physical evidence.[66]  On March 9, Hubbard underwent
another polygraph examination, which indicated that he was
"not attempting deception when questioned about the murder
of Mims by [Bell]."[67]

On March 12, Hubbard signed a written statement which
was almost identical to the testimony he would later give at
Bell's trial; in this statement, Hubbard detailed how Bell
robbed and shot Charles Mims.  In the statement Hubbard also
stated that Bell spoke with him on December 18, 1981, and
told him that the police would pick Hubbard up to speak to
him about Charles Mims.  According to the statement, Bell
asked Hubbard, "What do you know about it?" and Hubbard
replied, "I don't know nothing."  Bell replied, "That's what
I want you to say--you don't know nothing."  In his March 12
statement, Hubbard said that he had not previously told the
police what had happened because he was "afraid Randy [Bell]
would kill me if I did."  The statement went on to say that

_____

66.  Id.

67.  Id.

**55**

Bell had visited Hubbard in the county jail a few days after December 19, after Hubbard was arrested for the Malachi robbery, and had asked again if Hubbard had "told them anything."  Hubbard answered, "No, I ain't told them nothing," and Bell answered, "Don't worry about the body, I took care of that thing.  Just be cool."[68]

Finally, Hubbard's March 12 statement says that he consulted with his attorney before deciding to tell investigators what had really happened to Mims.  The statement does not indicate that he was offered anything in exchange for his cooperation.[69]

Hubbard remained in jail on the Malachi robbery charge until April 9, 1982, when he posted bond.[70]  Hubbard was arrested on different robbery charges, for the robbery of King Christian, on January 25, 1983.  He was released on

_____

68. March 12, 1982 Hubbard statement, Petitioner's exhibit 1A.

69. Id.

70. Jailer's Record, Petitioner's exhibit 47.

56

bond the next day.   Hubbard was eventually charged with second degree robbery in this case.

Bell's capital-murder trial began on May 2, 1983.   For several weeks before the trial, the State paid for Hubbard to stay at the Holiday Inn.   Hubbard testified at Bell's trial that he was being kept in "protective custody."

After Bell was convicted and sentenced to death, both robbery charges against Hubbard were dropped.   The Malachi charges were nol-prossed on July 19, 1983; the Christian charges were nol-prossed on September 20, 1983.[71]   In an earlier coram nobis proceeding in which Bell challenged his conviction and death sentence, a state court found that these charges were dropped at the request of the victims, Malachi and Christian.[72]

In 1993, Hubbard was incarcerated at Draper Correctional Facility in Elmore, Alabama.   He wrote two letters to Bowers,

_____

71. Case action summary, case number DC 83-53, Petitioner's exhibit 47.

72. Bell v. Alabama, CC 83-35.62 (Circuit Court of Chilton County), order entered Oct. 26, 1990, Petitioner's exhibit 96, pp. 4-5.

who had been his attorney in the Malachi case.  Hubbard asked

Bowers to help him get transferred to a prison in another

State because he felt his life was in danger; friends of

Bell's, who were also incarcerated at Draper, knew that he

had testified against Bell and were threatening him.  One of

the letters states that Hubbard was offered immunity and an

agreement that he would be moved to another state in exchange

for his testimony in Bell's trial.  The first letter, dated

June 3, 1993, states in part:

> "Dear Sir: I'm writing you in concern with
> matters in which you represent me in 1981
> whereas I was called by the State to
> testify against Randy Bell in a Capital
> Murder case.
>
> ...
>
> "During the course of the trial I was
> offered immunity and an agreement that I
> would receive an opportunity to move to
> another state and change my identity for
> protection. In this case the prosecutor
> was the honorable Janice Claudia Williams
> and the Honorable Judge Bush.[73]

---

73.  The judge in Bell's trial was actually Judge Walter
Hayden.  Judge John Bush was the judge in Bell's 1990 state
collateral attack on his conviction in the Charles Mims
(continued...)

> "Sir at the time I was offered said
> agreement in exchange for my testimony I
> did not except the full agreement at that
> time because I had not receive any threat
> and was not confined in the Alabama penal
> system.
>
> "... Since my incarceration here at Draper
> I have ran into another problem with an
> associate of Randy Bell  ... He has been
> sending messages that I am an informer and
> a snitch and that nobody over here should
> in any way associate with me.  He has also
> made a threat that I need killing because
> I turn state evidence on Randy Bell ...
>
>                    ...
>
> "I would appreciate it if you could talk
> with prosecutor Jannice Williams and
> Honorable Judge Bush about said matter and
> send me affidavit saying the state did
> guaranteed protection for my testimony."[74]

Bowers did not send Hubbard an affidavit saying that the

State had guaranteed Hubbard protection, but he did speak

with Investigator Mims about Hubbard's letter and his request

---

73.  (...continued)
case, Chilton County civil case number CC-83-35.62.  Hubbard
testified in front of Judge Bush in that proceeding in June
1990.

74.  June 3, 1993 Hubbard letter, Petitioner's exhibit
48.

to be transferred.  Hubbard's second letter to Bowers, sent

July 19, 1993, states:

> "I'm writing you in concern of my previous
> letter, thank you very much for contacting
> the district attorney office, Mr. Benny
> Mims the investigator for their office
> call down here on July 2, 1993 but we
> could not talk at that time in privacy
> because the Captain was in the room and I
> explain that to Benny so he assured me
> that he would be down here to draper in
> person the following Friday which was July
> 9, 1993 but he fail to keep his
> appointment.
>
> "I then called Benny house several times
> on three way communication but could not
> get in touch with him personally, so I
> left messages. ...
>
> "Sir basically what I would appreciate for
> you to do is to see to it that I am
> immediately transferred from Draper
> Correction Facility. ..."[75]

At some point after this, Investigator Mims or Assistant

District Attorney Clardy arranged with the Alabama Department

of Corrections to have Hubbard transferred to a prison in

Arkansas.

---

75.  June 19, 1993 Hubbard letter, Petitioner's exhibit
74.

As this court noted in its 2001 opinion, Hubbard's letter is strong evidence that the State offered him immunity in exchange for his testimony at Bell's trial. The existence of such a deal was not disclosed to the defense. However, this court also noted that it is necessary to "weigh and probe the weight of Hubbard's letter, and Hubbard's own credibility regarding its contents, before denying or granting relief on this claim." <u>Bell</u>, 2001 WL 1772140, *31.

Hubbard did not attend the evidentiary hearing that this court held in August 2002, but a videotaped deposition that he gave in July 2002 was introduced as evidence. In the deposition, Bell's counsel questioned Hubbard extensively about his 1993 letters to Bowers and about whether the State promised him anything in exchange for his testimony at Bell's trial. Hubbard stated repeatedly that no-one from the State ever spoke with him directly about any deal or immunity in exchange for his testimony.[76]

_____

76. Hubbard deposition, Petitioner's exhibit 75, p. 16 (Hubbard did not ask Clardy or Investigator Mims or anyone else if they could help him if he cooperated); p. 17 (Clardy (continued...)

However, Hubbard stated that Bowers, his lawyer, told
him that he would receive immunity and protection in exchange
for his testimony.  Hubbard explained that he decided to
start cooperating with the investigators in March 1982
because he realized that Bell might try to blame him for
Charles Mims's murder.[77]  Hubbard told Bowers that Bell had
killed Charles Mims, and Bowers spoke with the investigators
on Hubbard's behalf.  According to Hubbard, Bowers told him

---

    76.  (...continued)
and Investigator Mims did not tell him they would help him,
and he did not believe they would help him); p. 22 (neither
Clardy nor Investigator Mims nor Perdue told him they would
"do right" by him);  p. 65 (Clardy and Investigator Mims did
not tell him that if he told his story at trial he would be
treated as a witness, not a defendant).

    77.  Bell's attorney asked Hubbard if he remembered
telling her on an earlier occasion that he decided to tell
his story to Investigator Mims and Assistant District
Attorney Clardy because "they took you into a room with
windows, where you could see and hear Randy Bell talking to
John Perdue, but Randy could not see you?"  Hubbard
answered, "Well, I remember that."  Hubbard deposition,
Petitioner's exhibit 75 p. 18.  Later, Hubbard stated,
"Well, once I seen--when I looked through that window and
Randy could see me and I couldn't see him, you know, that's
when--when everything, you know, when I knew I needed an
attorney, you know.  And so, I told [Bowers] what had
happened, and then he went and told them [the investigators
or prosecutors]." Id. at 31.

that if he testified at trial and cooperated with the
prosecution that he would be only a witness and not a
defendant; and that the government would protect him, help
him move to another State, and change his identity.[78]
Specifically, Hubbard said:

> "Well, [Bowers] told me that for my
> testimony that I wouldn't be charged with
> the crime, and I would have the
> opportunity to move to another state,
> change my identity and get a new life, you
> know.  That was basically it."[79]

Hubbard stated that he did not discuss this directly with
anyone from the State; instead, he said, Bowers "would talk
to them and then he--then he would come back and let me know
what was happening."[80]

When the respondents' attorney asked Hubbard what he
meant by "immunity" in his June 1993 letter to Bowers,
Hubbard answered, "Well, Robert Bowers, when he--when he came
and told me that an immunity means that I wouldn't be charged

---

78.  Id. at 20, 21.

79.  Id. at 32.

80.  Id. at 23.

with the murder, if I told the truth about what had happened, that I would get a chance to move to another state and change my identity and so on like that."[81]

The court has some doubts about whether Hubbard was revealing the full extent of his communications with the State during his deposition.[82]  Hubbard was eager to deny any involvement, or discussions, with the State's investigators and prosecutors, to the point that he made false statements in order to minimize his contact with them.  Specifically, Hubbard vehemently insisted that no-one prepared him to testify at Bell's trial.[83]  That position, however, is

_____

81.  Id. at 53.

82.  During the course of Hubbard's deposition, Bell's attorney attempted to impeach him with prior inconsistent statements that Hubbard allegedly made to her and to a private investigator several months before the deposition. However, Hubbard denied making these statements, and Bell's attorney did not offer any admissible evidence to show that they occurred.  Thus, the court has disregarded this impeachment in its evaluation of Hubbard's credibility.

83.  Hubbard deposition, Petitioner's exhibit 75, pp. 7 ("No, I ain't never practiced"), 8 ("When you keep saying, 'Get ready,' what do you mean, 'Getting ready'?  I mean, I-- you're saying it as though I was prepped or something like
(continued...)

inconsistent with the testimony of all the other witnesses and is simply implausible, given that he was the prosecution's key witness in a capital-murder trial. Hubbard stated that he did not speak with Assistant District Attorney Clardy before the trial;[84] this is also not credible or consistent with the testimony of the other witnesses. Hubbard also insisted that he spoke with Investigator Mims only once during the weeks that he stayed at the Holiday Inn before Bell's trial.[85]   However, Investigator Mims stated that he spoke with Hubbard almost every day during this period.[86]   More generally, Hubbard denied having any relationship with Investigator Mims,[87] even though he wrote him a letter as recently as 2000 which he signed "your friend

_____

83.  (...continued)
that.   I don't--I wasn't--I wasn't getting ready"), 12 ("They didn't never prepare me for trial"), 13 ("I didn't need no script or nothing like that, or whatever.")

84.  Id. at 11.

85.  Id. at 10, 11.

86.  Benny Mims 2002 deposition, Petitioner's exhibit 78, p. 58.

87.  Hubbard deposition, Petitioner's exhibit 75, p. 27.

for life."[88]   Hubbard's reluctance to tell Bell's counsel
about his dealings with the State may stem from Hubbard's
general desire not to help Bell because of Bell's alleged
threats on Hubbard's life.  Also, in Hubbard's 2000 letter
to Investigator Mims, he told him that Bell's attorney had
visited him in prison and expressed concern that Bell's
attorney might be blocking his parole plan.

Of course, Hubbard's inability to remember certain
details of the period surrounding Bell's trial is not
surprising, and by itself would not mean that he is lacking
in credibility.   However,  the  fact  that  Hubbard's
misstatements consistently minimized his contacts with the
prosecutors and the State's investigators leads the court to
believe that he was purposefully obfuscating rather than
simply failing to remember details. Further, Hubbard's claim
not to have any relationship with Investigator Mims when he
apparently considered him a good friend as recently as 2000

---

88.  Deposition  exhibit  7,  attached  to  Hubbard
deposition, Petitioner's exhibit 75.

belies the possibility that Hubbard's misstatements are simply due to lapses in memory.

The fact that Hubbard lied in order to minimize his dealings with the State strengthens the conclusion that he was not lying when he stated, in his 1993 letters and in his deposition, that the State promised him he would not be prosecuted in relation to Charles Mims's murder if he testified at Bell's trial.  In his 1993 letter to Bowers, Hubbard had no reason to fabricate the State's offer of immunity; rather, he had an incentive to remind Bowers of what the State had promised him.  Further, if the State had only promised Hubbard that it would try to protect him by helping him move to another State after Bell's trial, Hubbard could have simply said this in his letter.  In his deposition, Hubbard admitted that the State had offered him immunity (albeit through Bowers) even though his general pattern was to minimize any contacts he had had with the State.

No other witness provided direct evidence to corroborate Bell's allegation that the State's investigators or prosecutors made Hubbard a formal promise of immunity in exchange for his testimony in Bell's trial.  Prosecutor Clardy explained that Hubbard began to cooperate with the prosecution without being promised anything.  Clardy said that Hubbard "called his lawyer and told him he wanted to tell him something," and then Bowers contacted her or the investigators, and Hubbard told them what had happened.[89] Clardy described Hubbard's cooperation as coming "out of the clear blue."[90]  According to Clardy, Hubbard was "a scared kid" who "said he couldn't sleep at night and he had [to] tell us what had happened."[91]

Clardy was the main decision-maker in the Charles Mims case, and also in the decision to drop the Malachi and

_____

89.  Clardy 2002 deposition, Petitioner's exhibit 80, pp. 31, 54.

90.  Id. at 31.

91.  Id.

**Christian robbery charges against Hubbard after the trial.[92] However, she denied that she offered Hubbard anything in exchange for his testimony,[93] or threatened him with the charges pending against him.[94]   She denied that Hubbard told her he would testify as the government wished if she would help him with the pending charges, or if she would agree not to charge him with Charles Mims's murder.[95]   She conceded that Hubbard "may have thought" that she would help him with the pending charges, although she "never told him that I would or I wouldn't [help him]."[96]**

**Clardy stated that she did not charge Hubbard in relation to Charles Mims's murder because she did not believe he was a participant in the murder.  Referring to March 3, 1982, when Hubbard first told the story of how Bell killed**

---

**92.  Id. at 26**

**93.  Id. at 47-48.**

**94.  Clardy 2002 deposition, Petitioner's exhibit 80 p. 28.**

**95.  Id. at 48.**

**96.  Id. at 29.**

Charles Mims and showed investigators the place where it
allegedly happened, Clardy said:

> "I get emotional talking about it.  The
> day that Michael Joe [Hubbard] showed us
> what happened, I watched his face and I
> saw how terrified he was.  He was afraid
> for his life.  And I never considered him
> a co-defendant, never.
>
> "He was a kid that was in the wrong place
> at the wrong time.  And he was afraid that
> Randy [Bell] was going to kill him, and I
> was too.   I was afraid that Randy was
> going to have him killed to keep from
> being prosecuted.
>
> "I never considered him a participant.  I
> considered him just like somebody who
> might have been standing in a bank when
> somebody robbed it and is forced to do
> certain things.  And I never considered
> him a co-defendant; I never considered him
> a participant."[97]

Clardy did say that she told Hubbard that he needed to

tell the truth, and that in light of his fear of Bell she

would "do everything in my power to keep him safe."[98]   She

stated that Hubbard was kept in the Holiday Inn before the

_____

   97.  Id. at 42-43.

   98.  Id. at 31.

70

trial in order to ensure his safety; he had been in the Chilton County Jail prior to that, but she was afraid that he might be killed in jail.[99]  Clardy also confirmed that she helped arrange for Hubbard to be transferred from Alabama to Arkansas in 1993.  She said this was because Hubbard felt threatened in prison.[100]

When asked about the letter in which Hubbard stated that he had been offered "immunity" in exchange for his testimony in the Bell case, Clardy surmised that Hubbard might have been referring to her telling him that she did not think he had done anything wrong:

> "I just believe that he did not understand the workings--I don't know why he called it immunity.  I told him that if he testified and told the truth--that I never thought he did anything wrong.  So, I mean, that--that could be him saying I offered him immunity.
>
> ...

---

99.  Clardy 1996 deposition, Petitioner's exhibit 64 p. 35.

100.    Clardy 2002 deposition, Petitioner's exhibit 80 at 20, 60.

> "Again, I didn't call it offering him
> immunity, but he knew that I believed his
> story and I didn't think he was guilty of
> anything.      So   if    that   is   loosely
> translated to offering immunity, I guess
> that may be where he got it from."[101]

Clardy stated that, during the years when she was a prosecutor, her general practice was to tell witnesses and defendants that "[i]f you're truthful with me and you're truthful with the Court, I will do the right thing by you." In a particular case, the "right thing" might involve "trying to help them get back on the right road or trying to help them get help with a drug problem, whatever."[102]  She stated that defense attorneys probably advised their clients to talk to her because "the defense attorneys know me well enough to know that if I--if somebody deserved a chance, I would give it to them."[103]  However, Clardy pointed out that at the time of Bell's trial, she had only been an Assistant District

---

101.      Id. at 59.

102.      Id. at 37.

103.      Id. at 39.

Attorney for a short time, and so she had not yet established that reputation.[104]

Bell argues that this court has previously found that "Clardy's credibility is lacking."[105] Bell points to the portion of this court's 2001 opinion which discussed the conflict between Austin's trial testimony about a conversation with Bell on the night of Charles Mims's disappearance and Austin's undisclosed January 12 pretrial statement about a conversation with Bell several days later. The court noted that Clardy had suggested that Austin's trial testimony could be explained as non-perjurious if Austin and Bell had more than one conversation. However, as the court noted, "This evidence does not consist of anything more than Clardy's conjecture. ... [T]here is no indication in the record that provides any additional support for Clardy's contention." Bell, 2001 WL 1772140, *27. However, Clardy did not assert that it was a fact that Austin and Bell had

_____

104. Id. at 76.

105. Bell's brief in support of petition for writ of habeas corpus, filed Aug. 16, 2002 (Doc. no. 142), p. 5.

more than one conversation; she simply suggested that this was a way to reconcile the two statements.  This is not evidence of a lack of credibility.

However, in another portion of the 2001 opinion this court did find reason to doubt Clardy's credibility.  One of Bell's claims, which the court found he could not pursue because he had not shown cause for his failure to present the evidence in state court, was that the State had systematically used its peremptory strikes to strike African-Americans from the jury venire in violation of <u>Swain v. Alabama</u>, 380 U.S. 202, 85 S.Ct. 824 (1965).  Part of Bell's evidence was that Clardy had written the letter "B," for "Black," next to the names of all of the African-Americans on the jury venire and had then struck all of them.  In state court, Clardy claimed that she made the marks for identification only.  However, this court concluded that her explanation to the state court was not supported by the evidence.  <u>Bell</u>, 2001 WL 1772140, *18.  Specifically, Clardy admitted, in passing, during her deposition that race was one

**74**

of the factors she considered when exercising peremptory strikes. Further, she stated that she made an "X" mark by the names of venire members about whom she "didn't have a good feeling," but she struck all of the African-American venire members even though she had not made "X" marks by any of their names. Thus, the court discounted Clardy's explanation and concluded that the evidence established a "strong probability" that Clardy had exercised her strikes on the basis of race. Id. at 20. While the court did not explicitly state as much, this necessarily entails a finding that Clardy was lacking in credibility. A finding that Clardy's testimony on one topic was not credible does not necessarily mean that her testimony on other subjects is not credible, but neither does it inspire confidence in her overall credibility. The court will keep this in mind when evaluating the evidence.

Investigator Mims's testimony was consistent with Clardy's. He denied that he promised Hubbard any leniency or any help with the robbery charges pending against him in

exchange for his testimony in the Bell trial.[106]  Neither did
he admit knowledge of anyone telling Hubbard he would not be
charged with the murder if he cooperated.[107]  He stated that
he was not surprised that Hubbard was not charged with
Charles Mims's murder because, as he said, "I don't think he
participated in the murder."[108]  He stated that he believed
Hubbard's explanation of how the murder occurred.[109]
Investigator Mims also confirmed Clardy's statement that
Hubbard was put up at the Holiday Inn for his own
protection.[110]

Bell's attorney asked Investigator Mims about his
relationship with Hubbard before Charles Mims's

---

106.    Benny Mims 2002 deposition, exhibit 78, pp. 62,
78; Benny Mims deposition, taken Nov. 18, 1996 [hereinafter
Benny Mims 1996 deposition], Petitioner's exhibit 62, p. 69.

107.    Benny Mims 2002 deposition, Petitioner's
exhibit 78, pp. 72-73.

108.    Id. at 69.

109.    Benny Mims 1996 deposition, Petitioner's
exhibit 62, pp. 40, 43.

110.    Benny Mims 2002 deposition, Petitioner's
exhibit 78, pp. 93-94.

76

disappearance.  Investigator Mims confirmed that Hubbard was a "local snitch" who would sometimes call him at home to give him "bits and pieces" of information.[111]  Investigator Mims stated that it was not unusual that Hubbard called him at home, because it was the policy of the Sheriff's Department that his home phone number be public; he said he often got calls at home from defendants as well as from crime victims.[112]

With regard to Hubbard's 1993 request for help in getting transferred to a different prison, Investigator Mims confirmed that Bowers contacted him about Hubbard's letter, and that he then spoke with Hubbard himself.  After Hubbard explained that he felt his life was in danger, Investigator Mims spoke with Clardy, and on Clardy's request called the Department of Corrections to see if Hubbard could be transferred to a prison in another State.[113]

---

111.     Id. at 49-50.

112.     Id. at 46.

113.     Id. at 85.

ABI Agent Perdue also confirmed Clardy's and Investigator Mims's testimony that there was no explicit deal with Hubbard for his testimony.  However, as was the case with Perdue's statements about the alleged deal with Austin, Perdue was more nuanced in his description of his interactions with Hubbard than were Clardy and Investigator Mims.  Perdue confirmed Clardy and Hubbard's explanations of how Hubbard began to cooperate with the State: he said that Bowers approached the investigators and said that Hubbard wanted to speak with them and that Hubbard was a witness to the murder.  When asked if he had "had any conversations with Mr. Bowers concerning leniency or the treatment of Michael Joe Hubbard during the investigation," Perdue replied that Bowers had "talked about the fact that, you know, if [Hubbard] was telling him the truth ... then Michael Joe [Hubbard] was a witness to the murder of Mims and Michael Joe did not plan the murder, did not plan the robbery, did not

know what was going to happen until everything occurred and
that he [Bowers] was encouraging him to cooperate with us."[114]

Perdue said that he told Hubbard that "if he told the
truth and it was determined that he was a witness[,] ... he
would be treated as a witness.  But if it was determined that
he actually participated, that he planned the murder of
Charles Mims, that he was lying to us, ... he would be
treated as a defendant."[115]

However, Perdue denied that there was any deal to give
Hubbard immunity in the Charles Mims case in exchange for his

---

114.     Perdue 2002 deposition, Petitioner's exhibit
79, p. 78.

115.     Perdue 1996 deposition, Petitioner's exhibit
63, p. 69; see also Perdue 2002 deposition, Petitioner's
exhibit 79, p. 76 ("I told him that if he lied about it, if
he was involved in it, that he could face problems"); id. at
74-75 ("I told [Hubbard] that if he lied to us and that he
was more involved--if he was involved as a participant in
the crime--if he was strictly a witness and did not know
what was going to happen, then that made him a witness.  But
if he planned to rob Charles Mims, that made him guilty of
a crime.  If he participated willingly in the robbery and
the murder of Charles Mims, that that would make him a
defendant.")

79

testimony.[116]   He stated that he was not surprised that
Hubbard was not charged because he believed Hubbard's story,
"based on the time that I spent with Michael Joe [Hubbard]
and the investigative efforts that went forth to determine
whether or not he was being truthful."[117]   Specifically,
Perdue said that he believed Hubbard because Hubbard admitted
his involvement in some criminal activity that they had not
previously known about, namely that he had stolen some
property for Charles Mims; because Hubbard passed a polygraph
test; and because, when Hubbard took the investigators to the
place where he said Bell had killed Charles Mims, the scene
was exactly as he described it, "down to the funny shaped
tree and the big leaves on the ground."[118]   He also stated

---

116.     Benny  Mims  2002  deposition,  Petitioner's
exhibit 78, pp. 80, 84.

117.     Id. at 69-70.

118.     Id. at 86-108.

that Hubbard was "real upset about what had happened to
Charles Mims."[119]

    Although he denied that there was a deal for immunity
with Hubbard, Perdue said he did remember "some discussion
with [Hubbard] regarding him going to another state and as
to whether or not we would need to change his--you know, try
to come up with some sort of a witness protection program."[120]
Perdue confirmed that the investigators and prosecutors were
worried about Hubbard's safety during the trial, and that
they put him in the Holiday Inn before the trial for his own
protection, "because we didn't want him to end up dead right
there at the trial."[121]

    Agent Perdue was less clear about whether the State made
a deal with Hubbard regarding the robbery charges.  He stated
that he did not remember telling Hubbard that he would help
him with the robbery charges, although he could not "say for

---

119.    Id. at 72.

120.    Id. at 80.

121.    Id. at 58.

sure" that such a conversation did not occur.[122]  He said he
believed that the robbery charges were dropped at the request
of the victims,[123] although he also surmised that the dropping
of the charges "certainly may have" had something to do with
Hubbard's cooperation at Bell's trial.[124]

Attorney Bowers did not confirm Hubbard's story about
what Hubbard was promised in exchange for his testimony.
According to Hubbard, Bowers was the one who communicated to
him that he would not be charged with a crime if he
cooperated with investigators; however, Bowers said that no-
one made any deal or agreement with Hubbard in his
presence.[125]  Bowers further said that he was not aware of any
offer of immunity until he received the letter from Hubbard
in 1993.[126]  He described the conversations between Hubbard

_____

122.    <u>Id</u>. at 60.

123.    <u>Id</u>.

124.    <u>Id</u>. at 64.

125.    Bowers deposition, Petitioner's exhibit 81, pp.
10-15.

126.    <u>Id</u>. at 19.

and the investigators before Bell's trial as "sort of congenial.  It all looked voluntary."[127]

Although Bowers represented Hubbard on the Malachi robbery case, he did not know why that charge was dropped. Bowers stated that his representation of Hubbard in that case required him to do "practically nothing" because "before the case came up, the State informed me that they were going to dismiss the charge. ... It was nol-prossed."[128]  Although a state court in an earlier proceeding found that the charges were dropped at the request of the victims, Bowers did not have any knowledge of the victims' requesting that the charges be dropped.[129]

Bowers's testimony contained inaccuracies that lead the court to question his recollection of relevant events. Hubbard, Clardy, and Perdue all agreed that Hubbard's cooperation began when Hubbard told Bowers he wanted to talk

---

127.    Id. at 15.

128.    Id. at 12-13.

129.    Id. at 13.

83

about Charles Mims's disappearance, and that Bowers contacted the investigators on Hubbard's behalf.  However, Bowers remembered his involvement in this process as being much less active; he stated that he was contacted by an investigator at the Sheriff's Office because "they wanted to take a statement or interrogate Michael Joe [Hubbard] about a new crime.  And since I had--I was his attorney on one matter, they wanted me to come in on it and just be there while they talked to him."[130]  Another inaccuracy in Bowers's testimony is his statement that Hubbard was not incarcerated, but was out on bond when he began cooperating with investigators[131]; in fact, Hubbard was still incarcerated.

Of course, it is not surprising that Bowers might not accurately remember all of the events surrounding this case, as they occurred more than 20 years before he gave his deposition. His misstatements appear to be failures of memory; there is nothing to suggest that he deliberately

---

130.     Id. at 10.

131.     Id. at 11.

misled the court.  However, in reviewing the facts the court will keep in mind that Bowers's recollection may not be entirely accurate.

District Attorney Hill testified in a deposition and in the evidentiary hearing in this court that he believed that Hubbard had received preferential treatment in exchange for his testimony.  Hill stated that "the fact that Mr. Hubbard was not charged in the crime was in and of itself lenient treatment. ... I assumed over and above that probably there had been some other arrangements made, but I don't have personal knowledge of it."[132]  Hill stated that in his experience as a prosecutor it was unusual that one of two people involved in a crime would escape charges altogether; the normal practice would be to charge both of them and then allow one to plead to a lesser charge.[133]

However, Hill admitted that he does not have personal knowledge of any deal with Hubbard.  As the court stated

---

132.     Hill deposition, Petitioner's exhibit 82 p. 25.

133.     Id. at 40.

above in discussing the alleged deal with Austin, even Hill's informed assumptions are not conclusive evidence.

Based on a careful examination of all the evidence before it, the court concludes that Bell has not shown by a preponderance of the evidence that the State promised Hubbard that the robbery charges against him would be dropped in exchange for his testimony.  Bell has not produced any real evidence to show this is the case.  Further, a state court made a factual finding that these charges were dropped at the victims' request, and this federal court must presume that that finding is correct in the absence of convincing evidence to the contrary.  28 U.S.C.A. § 2254.

However, the court concludes that Bell has shown by a preponderance of the evidence that the State had an understanding with Hubbard that if he testified at Bell's trial he would not be prosecuted in relation to Charles Mims's disappearance, and the State would help him to change his identify and move to another state if necessary to protect him.  As the court noted in its earlier opinions in

**86**

this case, Hubbard's 1993 letter, in which he states that he was offered immunity in exchange for his testimony in the Bell trial, is strong evidence that the State had indeed promised Hubbard he would not be charged in relation to Charles Mims's murder, and would be protected by the State after the trial, if he testified. In his deposition, despite his general tendency to lie in order to minimize his contacts with the State, Hubbard confirmed that he had been offered immunity. Hubbard stated that Bowers, and not an employee of the State, told him about the arrangement. Bowers does not remember communicating this message to Hubbard. However, Bowers did not remember contacting the State on Hubbard's behalf at all. All of the witnesses except Bowers stated that Hubbard first told his story to Bowers, and then Bowers contacted the State on Hubbard's behalf. It is consistent, then, that the State would have sent a message to Hubbard through Bowers. Also, as a general matter it is quite reasonable that Bowers, as Hubbard's attorney, would be the one to communicate this message to Hubbard. The court finds

that Bowers did communicate this message to Hubbard but simply does not now remember doing so, since, as noted above, his memory of the events of over 20 years ago has faded.

Further, the court finds that this same message was also communicated to Hubbard by Clardy.  Hubbard's insistence that no-one with the State ever talked to him about the agreement for his testimony is consistent with his efforts during his deposition falsely  to minimize the contacts he had with the State.   However, while Clardy denied offering Hubbard immunity in exchange for his testimony, the court finds that her testimony actually supports the conclusion that she agreed not to prosecute Hubbard, and to try to protect him in the future if he testified in Bell's case.  She stated that she told Hubbard that "if he testified and told the truth--that I never thought he did anything wrong.  So, I mean, that--that could be him saying I offered him immunity."[134]  Clardy's words indicate that what she told Hubbard was not simply that she would not charge him with the

_____

134.    Clardy 2002 deposition, Petitioner's exhibit 80, p. 59.

crime no matter what, but that if he testified and told the truth that she would not charge him.  Clardy's testimony that Hubbard "knew I believed his story and I didn't think he was guilty of anything"[135] is also consistent with the conclusion that she reassured him he would not be charged if he testified.

Clardy's statements that she would "do everything in my power to keep [Hubbard] safe"[136] are also consistent with the conclusion that she made an informal agreement with Hubbard. Perdue also confirmed that he discussed with Hubbard that the State would try to arrange for "sort of a witness protection program" for Hubbard.[137]

It is certainly possible that Clardy would not have charged Hubbard, and would have attempted to assure his future safety, even if he had refused to testify at Bell's trial.  However, Hubbard was undoubtedly concerned about the

---

135.    Id.

136.    Id. at 31.

137.    Perdue deposition at 80.

possibility that he would be charged in connection with Charles Mims's death, and Clardy's reassurances must certainly have been important to him. More importantly, knowledge of these reassurances might have been important to the jury in determining Hubbard's credibility at trial.

### C.   Summary of Court's Factual Findings

In summary, after a careful review of the evidence, the court finds the following:

First, Austin made a pretrial statement to the police which was not disclosed to the defense. Second, Austin testified in court in a way that was inconsistent with his pretrial statement, and the prosecution did not correct his testimony.

Third, Bell did not prove by a preponderance of the evidence that the State had an explicit agreement with Austin before he testified. However, ABI Agent Perdue did discuss the Chilton County charges with Austin before the Bell trial, and told him that if he had questions about the charges, they

could discuss them later.  Perdue expected Austin to ask him for help after the trial; Austin did so; and Perdue obliged by writing a letter to the Tuscaloosa District Attorney asking him to show Austin leniency.  Further, while preparing Austin to testify at  Bell's trial, District Attorney Hill threatened Austin by saying that he would speak to the Tuscaloosa District Attorney about the Habitual Offender law if Austin did not start remembering things according to his ABI statement.  After this, Austin began answering questions according to his ABI statement, which differed from his undisclosed pretrial statement and was consistent with the State's theory of the case.

Fourth, while Bell did not prove that the State formally promised Hubbard immunity in exchange for his testimony, Bell has proven that the State assured Hubbard that if he testified truthfully, he would not be charged in relation to Mims's disappearance, and that the State would arrange for him to leave the State and to change his identity if it was necessary to protect his safety.

## V.   DISCUSSION

Having analyzed the evidence and made factual findings concerning it, the court will now turn to whether Bell is entitled to relief under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), based on the State's failure to disclose (1) Austin's pretrial statement, (2) the evidence of District Attorney Hill's threat to Austin and ABI Agent Perdue's nonspecific offer of possible help to Austin after Bell's trial, and (3) the State's assurances to Hubbard that he would not be charged with a crime and would be offered protection if he testified truthfully at Bell's trial.   The court will also analyze whether Bell is entitled to relief under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763 (1972), based on the State's failure to correct Austin's trial testimony.[138]

_____

138.      Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763 (1972) dealt with a prosecutor's failure to correct a witness's statement that he had not been offered anything in exchange for his testimony.  Because of this, some courts confronted with claims that the prosecution suppressed (continued...)

## A.  <u>Brady</u> standard

Due process is violated when the prosecution (1) suppresses evidence, (2) the evidence was favorable to the defendant, and (3) the evidence is material to the defendant's guilt or punishment.  <u>Carr v. Schofield</u>, 364 F.3d 1246, 1254 (11th Cir. 2004); <u>Stano v. Dugger</u>, 901 F.2d 898, 899 (11th Cir. 1990) (en banc); <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194 (1963).  Impeachment evidence falls within the <u>Brady</u> rule just as does exculpatory evidence, because impeachment evidence may be "evidence favorable to the accused" such that, if it is used effectively, it "may make

---

138.    (...continued)
evidence of a deal with a witness call these claims <u>Giglio</u> claims.  However, this is somewhat confusing, because <u>Giglio</u> and its progeny address the standard to be applied when prosecutors subvert the truth-finding mission of the court by allowing false testimony to go uncorrected.  By contrast, <u>Brady</u> and its progeny address the somewhat different standard to be applied when the petitioner claims that the prosecution failed to disclose material, favorable evidence.

Thus, this court will refer to Bell's claim that the prosecution failed to disclose evidence, including impeachment evidence, as his "<u>Brady</u> claim," and will refer to his claim that the State failed to correct false testimony as his <u>Giglio</u> claim.

the difference between conviction and acquittal." <u>United States v. Bagley</u>, 473 U.S. 667, 105 S.Ct. 3375 (1985); <u>see also</u> <u>Napue v. State of Illinois</u>, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177 (1959); <u>Carr</u>, 364 F.3d at 1254.

In order to show that suppressed evidence is material, a habeas petitioner must show that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). Four "guideposts" focus the court's materiality analysis. First, in order to show that suppressed evidence is material, a petitioner need not show "by a preponderance of the evidence that disclosure would have resulted ultimately in the defendant's acquittal." <u>Hays v. Alabama</u>, 85 F.3d 1492, 1498 (11th Cir. 1996); <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566 (1995). In other words, "undisclosed evidence can require a new trial even if it is more likely than not that a jury seeing the new evidence would still convict." <u>Hays v. Alabama</u>, 85 F.3d

1492, 1498 (11th Cir. 1996).  The petitioner must simply show

that "the Government's evidentiary suppression undermines

confidence in the outcome of the trial."  Kyles, 514 U.S. at

434, 115 S.Ct. at 1566; Hays, 85 F.3d at 1498.  Second, and

relatedly, a defendant "need not show there was insufficient

evidence to convict in view of the suppressed evidence."

Kyles, 514 U.S. at 434, 115 S.Ct. at 1566; Hays, 85 F.3d at

1498.  Third, there is no "harmless error" analysis of Brady

errors.  Kyles, 514 U.S. at 434, 115 S.Ct. at 1566; Hays, 85

F.3d at 1498.  Fourth, the materiality of alleged Brady

information is not to be judged on an item-by-item basis, but

"in terms of the cumulative effect of suppression."  Kyles,

514 U.S. at 437, 115 S. Ct. 1567; Hays, 85 F.3d at 1498.

Whether suppressed evidence was material is a mixed

question of law and fact.  Hays, 85 F.3d at 1498.


### 1.  Austin's pretrial statement

There is no doubt that Austin's pretrial statement was

suppressed by the prosecution.  While the prosecutors claim

95

not to remember ever seeing it, the statement was found in District Attorney's file.  The statement was taken by ABI Agent Perdue, who was an investigating officer on the Charles Mims case, and who testified that he would have turned the statement over to the prosecutors in the normal course of his investigation.  Even when evidence known to police is never turned over to the prosecutors, knowledge of the evidence is imputed to the prosecutors for <u>Brady</u> purposes.  <u>Kyles v. Whitley</u>, 514 U.S. 419, 438, 115 S.Ct. 1555, 1568 (1995); <u>Giglio v. United States</u>, 405 U.S. 150, 154, 92 S.Ct. 763, 766 (1972); <u>Williams v. Griswald</u>, 743 F.2d 1533, 1542 (11th Cir. 1984).  This is because "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." <u>Giglio</u>, 405 U.S. at 154, 92 S.Ct at 766.  To adopt any other rule would "substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." <u>Kyles</u>, 514 U.S. at 438,

115 S.Ct. at 1568.  The fact that Perdue was employed by the ABI, rather than by the Chilton County Sheriff's Department, does not change this analysis, since the ABI and Chilton County officials cooperated extensively in the investigation. See Hays v. Alabama, 85 F.3d 1492, 1497 n.2 (11th Cir. 1996); United States v. Antone, 603 F.2d 566, 570 (5th Cir. 1979).[139] Recognizing that knowledge of the statement is imputed to the prosecutors through the police, the government concedes in its brief that "Austin's pretrial statement was not disclosed to the defense and it should have been."[140]

There is also no question that Austin's pretrial statement was favorable to Bell.  Brady can be violated by the suppression of impeachment evidence as well as by the suppression of exculpatory evidence.  Carr, 364 f.3d at 1254;

---

139.    In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

140.    Brief of respondent on Brady/Giglio issues, filed Aug. 16, 2002 (Doc. no. 143), p. 3.

see also Napue, 360 U.S. at 269, 79 S.Ct. at 1177).  While Austin's pretrial statement is certainly not exculpatory with respect to the murder of Charles Mims, in that it implicates Bell in the shooting, the defense could have used it to impeach Austin since it was inconsistent in several ways with his trial testimony.  Recognizing this, the government states in its brief that the statement "might have been used by the defense during cross-examination of Austin."[141]

The government argues, however, that the Austin pretrial statement is not material.  Since the materiality of suppressed evidence must be judged cumulatively, the court will first turn to the other allegedly suppressed evidence before analyzing materiality.


2.  Threat to and understanding with Austin

As explained above, although the State did not make an explicit deal with Austin, Agent Perdue discussed Austin's pending Tuscaloosa County robbery charges with him before he

---

141.    Id.

testified and told him they could discuss the charges later, with the expectation that Austin would ask for help with those charges after the trial.  Consistent with this expectation, Austin did ask Perdue for help, and Perdue obliged by writing a letter to the Tuscaloosa District Attorney asking him to show leniency to Austin.  Also, while preparing Austin to testify at Bell's trial, District Attorney Hill threatened Austin that, if he did not start remembering his testimony in accordance with his ABI statement, Hill would drive to Tuscaloosa to speak with the District Attorney of Tuscaloosa, his "good friend," about applying the Habitual Offender Law to Austin.

The fact that the State did not make a formal deal with Austin does not end the court's inquiry.  The State's duty to disclose evidence of deals or understandings with witnesses does not extend to only formal, enforceable grants of immunity.  Haber v. Wainwright, 756 F.2d 1520, 1524 (11th Cir. 1985).  Its duty extends to "any understandings or agreements."  Giglio v. United States, 405 U.S. 150, 155, 92

S. Ct. 763, 766 (1972); <u>Williams v. Brown</u>, 609 F.2d 216, 221 (5th Cir. 1979) (duty to disclose extends to "any promises, agreements, and understandings"). The point of the court's inquiry is "to ensure that the jury knows the facts that might motivate a witness in giving testimony." <u>Brown v. Wainwright</u>, 785 F.2d 1457, 1465 (11th Cir. 1986) (quoting <u>Smith v. Kemp</u>, 715 F.2d 1459, 1467 (11th Cir. 1983)).

However, under circuit precedent some understandings are too insubstantial to count as "promises" or "understandings" for <u>Brady</u> purposes. In <u>McCleskey v. Kemp</u>, 753 F.2d 877 (11th Cir. 1985) (en banc), the Eleventh Circuit held that a detective's promise to a witness that he would "speak a word" for a witness about a pending escape charge did not even constitute an "understanding" for due process purposes because it "offered such a marginal benefit ... that it is doubtful it would motivate a reluctant witness, or that disclosure of the statement would have had any effect on his credibility." <u>Id</u>. at 884. The court also held that even if the promise to "speak a word" did constitute a "promise," the

nondisclosure of the promise was not material because there was no reasonable likelihood that it would have changed the jury's mind. <u>Id</u>. <u>See also</u> <u>Depree v. Thomas</u>, 946 F.2d 784 (11th Cir. 1991) (reaching same conclusion when detective told one witness he would "speak a word" for him and detectives told other witness they would "take care" of him).

In view of these cases, Agent Perdue's statement to Austin that he could discuss Austin's pending charges after Bell's trial was too insubstantial to constitute a "promise." Although Austin may have hoped that Perdue would help him with the pending charges, and although Perdue did, in fact, help him by writing a letter on his behalf after the trial, Perdue in fact did not promise Austin anything before the trial.

However, District Attorney Hill's threat to Austin was certainly substantial enough to constitute impeachment evidence which would have been favorable to the defense if it had been disclosed. <u>See</u> <u>United States v. Scheer</u>, 168 F.3d 445, 452-53 (11th Cir. 1999) (prosecutor's threat to

101

prosecution witness was favorable and material to defendant).

The defense certainly could have cross-examined Austin about

the fact that he had at some point been unable to clearly

remember what happened during his conversation with Bell, and

that after Hill threatened to discuss the Habitual Offender

Law with the Tuscaloosa District Attorney, Austin immediately

began to recite his testimony as he had given it previously.

As the court will discuss further when it analyzes the

materiality of all the suppressed evidence, this impeachment

could have been especially effective in light of Austin's

inconsistent pretrial statement.


### 3.   Understanding with Hubbard

As discussed above, the court concludes that, while the

State offered Hubbard no formal immunity, he was reassured

that if he testified truthfully in Bell's trial, the State

would not prosecute him in connection with Charles Mims's

disappearance, and also would help him move to a different

state and change his identity, if that were necessary to
protect his safety.

Unlike Agent Perdue's vague statement to Austin that he
could discuss Austin's pending charges after the trial, this
understanding with Hubbard was substantial enough to
constitute an "understanding" or "agreement" for Brady
purposes.  The assurances with Hubbard were similar to the
State's promise to a witness in Brown v. Wainwright, 785 F.2d
1457 (11th Cir. 1986).  There, the State insisted in federal
court that it had not given a witness favorable treatment in
exchange for his testimony.  However, the State also said
that "the only agreement reached between the State and [the
witness] provided that if [the witness] agreed to testify
before the Grand Jury and in the trial of the case, and if
he could pass a polygraph test while asserting his innocence
in the present case, then the State would not prosecute him
for the offense." Based on that representation, the Eleventh
Circuit said that it was "squarely presented with an adequate
record establishing that an agreement was made."  Id. at

103

1462-63.  The court rejected the State's argument that the
agreement was not really an agreement because it entailed no
"promise of leniency."  Id. at 1464.  The appellate court
noted that "the word 'promise' is not a word of art that must
be specifically employed."  Neither does the Brady rule apply
only to "promise[s] subject to acceptance" as opposed to
"bilateral agreements."  Id.  Finally, the agreement was no
less an agreement because it was conditioned on the witness
establishing that he was not culpable.  Id. at 1465.  The
point of the Brady inquiry is "to ensure that the jury knows
the facts that might motivate a witness in giving testimony
... which testimony could ... in any reasonable likelihood
have affected the judgment of the jury."  Id. (citations
omitted).

     As in Brown, here the State assured Hubbard that if he,
in Assistant District Attorney Clardy's words, "testified and
told the truth,"[142] the State would not prosecute him.
Although Hubbard was not required to take a polygraph test

_____

     142.    Clardy 2002 deposition, Petitioner's exhibit
80, p. 59.

as part of this agreement, in fact Hubbard did take a polygraph test six days after he first told the police about his involvement in Charles Mims's disappearance, and it was in part based on the results of that test that the State investigators believed that he was telling the truth.  Thus, like the agreement in <u>Brown</u>, the agreement with Hubbard does constitute an agreement, even though it was not a formal grant of immunity.  The fact that Hubbard described the State's assurances to him as a promise of "immunity" is further evidence that the promise was quite important and substantial to him.

Evidence of an agreement with Hubbard would also have been favorable to Bell.  While it was obvious at Bell's trial that Hubbard was not being prosecuted as Bell's codefendant, that did not necessarily mean that Hubbard would never be charged for his participation in Charles Mims's death.  In cross-examination Hubbard denied that he had been offered immunity or that he had not been promised anything for his

testimony.[143]   If the jury had known that the State had reassured him that he would not be charged in connection with Charles Mims's death if he testified and told the truth, that could have influenced their perception of his credibility. The question of whether this influence would have been material will be addressed later.

The State's promise to Hubbard that it would provide him with protection after the trial, on the other hand, would not have been favorable to Bell even if it had been disclosed. The fact that Hubbard was being kept in protective custody was disclosed during the trial at the very beginning of the State's direct examination of Hubbard. Bell's attorney cross-examined Hubbard about the fact that he was in protective custody, but only in the course of establishing that Hubbard had been picked up for two robberies since Mims's disappearance. Further cross-examination, either about the contemporaneous protective custody or the possible future witness protection, would not have benefitted Bell

---

143.     Trial transcript, pp. 217, 218.

because it would only have served to emphasize that Hubbard
was afraid that Bell might kill him.  This could not have
helped Bell's case.  <u>Green v. Vacco</u>, 961 F. Supp. 46, 49
(W.D. N.Y. 1997) (state's undisclosed promise to try to
enroll witness in state or federal witness protection program
was not <u>Brady</u> violation because defendant already knew that
witness was being held in protective custody and chose not
to cross-examine him about it).


### 4.  Materiality

       The court concludes that, taken together, the suppressed
evidence was material to Bell's punishment such that its
nondisclosure violated his due process rights.  If Bell had
known about Austin's January 12 pretrial statement, District
Attorney Hill's threat to Austin during trial preparation,
and the State's assurances to Hubbard that he would not be
prosecuted, there is a "reasonable probability" that the
outcome of the sentencing phase of Bell's trial would have
been different.  However, Bell has not shown a reasonable

probability that the outcome of the guilt phase of Bell's trial would have been different.

Because Charles Mims's body was never found, and there was no physical evidence showing that he was dead or how he died, Bell's conviction rested to a large degree on the testimony of Hubbard, as corroborated by the testimony of Austin.  Hubbard's testimony was the only evidence that Bell himself shot Charles Mims and that Bell robbed Charles Mims before killing him.  The information that the State had reassured Hubbard that he would not be charged in connection with murder if he testified could have made the jury more suspicious of his motivations for testifying. During cross-examination, Bell's lawyer asked Hubbard, "You came forward, because you're a good citizen and you wanted to help the police help solve this case, is that what you're telling this jury?", to which Hubbard answered, "That's right."  If the jury had known about the State's agreement with Hubbard, the jury might have concluded that, in fact, Hubbard was testifying against Bell in order to ensure that he would not

be charged himself, rather than just in order to help the police solve the case. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." <u>Napue v. Illinois</u>, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177 (1959). If the jury did not believe Hubbard's testimony, there would have been only circumstantial evidence that Bell killed Charles Mims.[144] Even more crucially, there would have been no evidence as to how Bell killed Charles Mims, if indeed he did so. Thus, Hubbard's personal credibility was crucial to the State's case. As Clardy said,

_____

144.    As this court noted in its 2001 order, "the evidence that independently corroborated Hubbard's testimony did not corroborate his testimony that Bell killed Mims, but rather that Bell was linked to the commission of the offense." <u>Bell v. Haley</u>, 2001 WL 1772140, *26 n.53 (M.D.Ala. 2001).

"Without [Hubbard's] testimony, there would have been no case."[145]

Austin's testimony was also crucial to the prosecution's case because he was the only witness who corroborated Hubbard's testimony about what happened on December 14, 1981, the night that Charles Mims disappeared.  No-one but Hubbard and Austin testified that they had actually spoken to Bell about his interactions with Charles Mims on December 14. Austin's testimony that, on the night Charles Mims disappeared, Bell came by Austin's house at 8:30 p.m., while the Monday night football game was on, that Bell had a flat tire, that Bell admitted to robbing Charles Mims, and that Bell showed him money he had taken from Charles Mims, all corroborated Hubbard's testimony about the robbery. Austin's testimony that Bell said that Hubbard had set up a meeting with Charles Mims to sell him some stolen goods, but that the meeting had "turned into" a robbery, also corroborated

---

145.    Clardy 2002 deposition, Petitioner's exhibit 80, p. 60; see also Hill deposition, Petitioner's exhibit 82, p. 41 ("Without Michael Joe Hubbard, there was no case.")

Hubbard's account that he had not participated in the planning of the robbery or murder.

If Austin's January 12 statement and the fact of District Attorney Hill's threat to Austin had been disclosed to Bell before trial, Bell could have used both pieces of information to impeach Austin.  These two pieces of information, taken together, could have seriously harmed the State's case such that there would be a reasonable probability that the jury would have recommended a sentence of life instead of death.

An effective impeachment of Austin using the suppressed evidence could have greatly affected the jury's estimation of his credibility in a way that no other evidence admitted at trial did.  Bell's attorney did attempt to impeach Austin at the trial by pointing out that he had been convicted of felonies in the past.[146]  However, an impeachment with the

---

146.    On direct examination, Hill asked Austin if he had been convicted of any felonies, and Austin replied that he had been convicted of first degree manslaughter, buying and receiving stolen property, and marijuana sales.  Trial transcript, p. 277.  Bell's attorney asked Austin one
(continued...)

evidence about Austin's inconsistent pretrial statements and Hill's threat would have been much more damaging than Austin's simple admission that he was a felon.   None of Austin's convictions were for crimes of dishonesty.   Whereas the evidence that Austin was a felon might have given the jury a general reason to doubt his credibility, impeachment based on Austin's inconsistencies and Hill's threat would have revealed to the jury specific evidence that Austin's testimony at trial might not be true and might be influenced by his desire to please the State in order to avoid harsher criminal sanctions in another case.   In other words, this impeachment would not have just "reinforce[d] a fact that the jury already knew; [it] would have introduced a new source of potential bias."   <u>Brown v. Wainwright</u>, 785 F.2d 1457, 1466 (11th Cir. 1986); <u>cf</u>. <u>Kelley v. Secretary for the Department of Corrections</u>, 377 F.3d 1317, 1361 (11th Cir. 2004)

_____

146.     (...continued)
question about this on cross-examination:   "You testified, Joe, that you have had some convictions in this court, is that correct?" Austin replied, "Yes."  Trial transcript, p. 279.

(suppressed immunity agreement was not material because impeachment with it would have been cumulative where witness was already impeached in numerous ways, including with evidence of grants of immunity for first-degree murder and for perjury).

The evidence of Hill's threat to Austin would have seriously damaged Austin's credibility.   An effective impeachment of Austin based on evidence of the threat would have shown that when Hill was preparing Austin for trial, Austin could not, or would not, accurately recount the details of what he was supposed to testify to.   Hill threatened Austin that he would drive to Tuscaloosa, where Austin had robbery charges pending against him, to speak with his "good friend" the Tuscaloosa District Attorney about applying the new Habitual Offender law to Austin.   After this, Austin began to remember very precisely the testimony he was supposed to give.

Hill's threat to Austin was similar to the prosecutorial threat at issue in United States v. Scheer, 168 F.3d 445

(11th Cir. 1999).  There, an Assistant United States Attorney had, during a meeting to go over a witness' testimony, threatened the witness that if he did not "come through" for the government, that he would "put the cuffs on you and you are going to be out of here in 45 seconds."  Id. at 449. Since the witness was on probation at the time, the prosecutor's words could be interpreted as a threat that the witness' probation would be revoked if he did not testify in a way that helped the government.  Id. at 449-50.  In Scheer, the court noted that it was not necessary for the defendant to prove that the witness in fact changed his testimony because of the threat; the appropriate inquiry was whether the suppression of the evidence of the threat undermined the reviewing court's "confidence in the trial."  Id. at 452. In that case, the court concluded that the suppressed evidence did undermine confidence in the trial because of the "importance and specificity" of the witness' testimony.  Id. Although the witness in question was not the only witness who testified against the defendant, and although there was other

testimony "that could support [the defendant's] conviction,"
the witness' testimony was important enough that his
credibility to the jurors was fundamental to the conviction.
Id. at 456.

       As was the case with the prosecution witness threatened
in Scheer, here Austin's testimony, and thus his credibility,
was very important to the State's case.  If the jury had been
aware of Hill's threat, it might have concluded that Austin
was testifying as the prosecutors wished in order to avoid
angering the prosecutors and thus facing harsher punishment
in Tuscaloosa.  Although Hill did not personally have the
power to make prosecutorial decisions in a Tuscaloosa case,
his statement that the Tuscaloosa District Attorney was his
"good friend" and that he would leave immediately to drive
to Tuscaloosa made his threat specific and realistic enough
that the jury might very well have concluded that it
influenced Austin's trial testimony.

       In Scheer, the Eleventh Circuit noted that there was no
other evidence that the government had an agreement with that

115

particular witness.  If the witness had previously agreed to cooperate with the government in exchange for some consideration, then "it would hardly be unusual or inappropriate for the prosecutor to remind the witness of the terms of their agreement." Id. at 457.  However, since there was no agreement, there was no reason other than the prosecutor's threat for the witness to worry that his probation could be revoked based on his testimony at trial. Id.  Likewise here, since the court has concluded that the State did not make any deal with Austin in exchange for his testimony, Hill's threat cannot be written off as a simple reminder to Austin about why he needed to cooperate.

If the prosecution had disclosed Austin's inconsistent January 12 statement to the defense, there is an even greater probability that the outcome of the sentencing phase of Bell's trial might have been different.  An effective impeachment of Austin based on the January 12 statement would have shown that the testimony he gave at trial was inconsistent with the story he told investigators the first

time he spoke with them.  At first he did not say that he saw Bell on the night Mims disappeared at all.  Further, the first story he told investigators was dramatically at odds with the State's theory of how Mims died, in that Bell told Austin that Hubbard had shot Mims first.  Since neither version of the story implicated Austin himself, and both implicated his friend Bell, there is no obvious reason why Austin should not have told the truth from the beginning, or why he should have changed his story as time went on.

Hill acknowledged in his deposition that an impeachment of Austin based on his January 12 statement could have done serious damage to the prosecution's case; he stated that had he been aware of the statement at the time of trial, he "would have been very concerned, because it would have basically hit at the very basis of our case.  I mean, like I say, I think that would have changed--that could have very easily clouded my attitude about our case."[147]

---

147.      Hill deposition, Petitioner's exhibit 82, p. 44.

The respondents argue in their brief that Austin's
January 12 statement is not credible.[148]   Of course,
prosecutors cannot choose to withhold potentially exculpatory
information simply because they personally not believe the
evidence to be true.   "It [is] for the jury, not the
prosecutor, to decide whether the contents of an official
police record [are] credible."  <u>Lindsey v. King</u>, 769 F.2d
1034, 1040 (5th Cir. 1985).  Otherwise, "prosecutors might,
on a claim that they thought it unreliable, refuse to produce
any matter whatever helpful to the defense, thus setting
<u>Brady</u> at nought."  <u>Id</u>.

However, if an inconsistent pretrial statement is
completely lacking in credibility, then there may be no
reasonable probability that the jury would have come to a
different conclusion even if it had been aware of the
statement.  <u>See, e.g.,</u> <u>Bell</u>, 2000 WL 33682804, *6 (holding

_____

148.    The court notes that, at an earlier stage in
this case, the respondents argued that Austin's January 12
statement simply reflected a different conversation between
Bell and Austin than he focused on in his trial testimony.
<u>Bell</u>, 2001 WL 1772140, *26-27.

that there was no reasonable probability that the verdict would have been different if the jury had considered the substance of Hubbard's inconsistent pretrial statement, in which he denied knowledge of what happened to Mims).

In support of its argument that Austin's January 12 statement is not credible, the respondents argue that Austin said during his deposition that he told the truth at trial but may have lied at other points during the investigation. However, during his deposition Austin was anything but clear about stating that his trial testimony was the truth or that his January 12 statement was not true.  When the State's attorney asked him if he lied during Bell's trial, he responded, "I couldn't say, you know, that I lied, but I could say this--you know what I am saying--I could say that--that--that I was what you would call pre-prepared, you know."[149]  When he was asked again if he lied, "yes or no," Austin said, "I don't know how to answer that, man.  You

_____

149.    Exhibit 73 at 44.

know, I'm really baffled."[150]  Austin also stated that he does

remember Bell telling him that Hubbard shot Charles Mims

first: "The only thing I remember is what Randy told me.

That's what sticks out vivid in my mind.  That's the only

thing that I remember.  I remember that he told me that

Michael Joe Hubbard shot Charles Mims."[151]

The other evidence the respondents offer to show that

Austin's January 12 statement is not credible is Investigator

Mims's and Agent Perdue's deposition testimony that, in their

experience, Austin would often fail to tell the whole truth

early in an investigation, but would eventually tell the

truth.  The basis for the investigators' conclusion is not

clear.  Further, the investigators' theory does not really

explain Austin's inconsistent statements in this case.

Investigator Mims's and Perdue's precise testimony was that

Austin tended to "give you a story a piece at a time,"[152] or

---

150.    Id.

151.    Exhibit 73 at 46.

152.    Benny Mims 2002 deposition, exhibit 78, p. 28.

120

that he always "held something back."[153]  Here, Austin first said that Bell confessed, several days after Charles Mims's disappearance, that both he and Hubbard shot Charles Mims while robbing him, and that Bell disposed of his body. Austin later said that Bell confessed, the night Charles Mims disappeared, to robbing Charles Mims himself.  This progression does not fit the Austin's supposed pattern of adding "a piece at a time" to a story, or holding back part of the truth.  Rather, Austin's story changed completely from one statement to the next.  Cf. Hays v. Alabama, 85 F.3d 1492, 1498 (11th Cir. 1996) (agreeing that witness's pretrial statements showed not a "pathological dishonesty," but "rather a consistent progression from obfuscation to truth-telling.").

Of course, the investigators did not testify about their impressions of Austin's truth-telling patterns at trial, because the issue of Austin's inconsistent statements did not

_____

153.     Perdue 2002 deposition, Petitioner's exhibit 79, p. 42.

come up.[154]  If they had so testified, it is possible that the
jury might have believed that they were honestly recounting
their impressions.  However, the court finds it unlikely
that, based entirely on the investigators' generalizations,
the jury would have concluded that the statements Austin gave
later were necessarily more credible than those he gave
earlier.

It is unlikely that the jury would have completely
credited Austin's trial testimony and discredited his
inconsistent January 12 statement.  In some cases it is clear
why a witness would lie to the police at first.  For
instance, Hubbard first told the police that he did not know
anything about Charles Mims's disappearance.  As this court
noted in its 2000 opinion in this case, Hubbard's
"explanation for lying during his initial interview [that he
was afraid that Bell would hurt him if he told the truth] was
far more credible than the story he concocted during that
interview."  Bell, 2000 WL 33682804, *6.

_____

154.   Perdue did not testify at Bell's trial,
although Investigator did.

122

By contrast, there is no good reason why a jury would have credited Austin's trial testimony over his January 12 statement.  There is no clear reason why Austin would have first concocted the elaborate story that Bell confessed, several days after Charles Mims' disappearance, that Bell and Hubbard robbed and shot Charles Mims, and that Bell disposed of Charles Mims's body, and why Austin would then later tell the truth, namely that Bell actually confessed on the night of Charles Mims's disappearance just to robbing Charles Mims. In fact, a more obvious explanation for the inconsistent statements would be that Austin told the police the truth first time, and later changed his story into one that better fit the State's theory of the case.  Another explanation would be that he was not telling the truth on either occasion, and was simply telling the police what he thought they wanted to hear.  Yet a third explanation would be that he was telling the truth on both occasions, and had two separate conversations with Bell about Charles Mims, but only testified about one of them at trial.

123

The court cannot conclude that, had the jury known about Austin's inconsistent pretrial statement, they would not have harmed their assessment of Austin's credibility.  Rather, the court finds that it is reasonably likely that, had the jury considered the inconsistent statements, especially in light of Hill's threat to Austin, they would have concluded that Austin's trial testimony was not entirely credible.

The State argues that Bell's attorney would likely not have used Austin's pretrial statement to impeach him because the statement incriminated Bell.  It is true that, according to Austin's January 12 statement, Bell confessed to shooting Charles Mims.   However, Bell's attorney might well have decided to use Austin's inconsistent statement to impeach Austin despite this fact.

First, Bell's attorney could have impeached Austin with the substance of his January 12 statement, but argued to the jury that, in fact, neither of Austin's statements to the police was credible; that Austin did not know anything about Charles Mims's death; and that when Austin made both

**124**

statements he was simply telling the police what he thought they wanted to hear in order to ingratiate himself to the police so that he would receive more lenient treatment as to the charges that were pending against him.  To bolster this argument, Bell's attorney could have pointed out that Austin did not speak with the police at all about his supposed conversation with Bell for over a year after Charles Mims disappeared, and that he gave the January 12, 1983 statement on the same day that he was picked up by the police for receiving stolen property.  Later, when Austin changed his story to one that corroborated the story Hubbard was going to tell at trial, he had several different charges pending against him.  Combined with the evidence that Hill had threatened Austin with a possibly harsher punishment in Tuscaloosa if he did not remember the testimony he was supposed to give--consistent with his ABI statement, and not his January 12 statement--the jury could well have concluded that neither Austin's testimony nor his January 12 pretrial statement were credible.

125

Put another way, the jury could have concluded, based on Bell's impeachment of Austin with the evidence of Hill's threat and Austin's inconsistencies, that Austin was so lacking in credibility that they would discount his testimony in its entirety.[155]

The respondents argue that Austin's pretrial statement could not have been admitted as substantive evidence to show that Hubbard was involved in Charles Mims's murder because it was hearsay.  However, even if the trial judge had given the jury a limiting instruction that the portion of Austin's

---

155.   In trial court's instructions to the jury at the end of Bell's trial, the judge instructed the jury as follows:

> "In evaluating the oral testimony of witnesses, some of the things which you may take into consideration are the following ... You omay consider any interest, any bias, any prejudice, friendship, that a witness shows.  You may consider any prior inconsistent statements that you find  that a witness has made. I charge you that if any witness has taken the stand and testified falsely to a material fact, you may in your discretion, disregard that witness's whole testimony."

See jury instructions, trial transcript, p. 360.

126

January 12 statement that implicated Hubbard was to be considered only for the purposes of impeaching Austin, and not for its truth, the jury could still have concluded that Hubbard may have played a part in Charles Mims' death. First, as stated above, the jury could have concluded that Austin's testimony was not credible, because of his inconsistencies and his motivation to testify as the State wanted him to in order to avoid harsher punishment in Tuscaloosa.  Then the jury's determination of whether Mims's murder occurred as  Hubbard said it did would have turned entirely on its assessment of Hubbard's credibility.  As stated earlier, if the jury had found Hubbard lacking in credibility, it would have had a more difficult time convicting Bell, and it is much more likely that it would not have sentenced Bell to death, because the jury would have been much less sure about how Mims's death occurred.

If the jury believed that Austin was telling the truth in his January 12 statement, and that Bell was telling the truth when he told Austin that he had shot Charles Mims while

he was still alive and had robbed him, the jury would still have convicted Bell of murder.  However, it might well have decided not to recommend a sentence of death for Bell based on lingering doubt about how Charles Mims's murder occurred and based on the possibility that Hubbard was also culpable for the murder.

In either case, whether the jury believed Austin's January 12 statement or not, the court finds that there is a reasonable probability that, had the jury been appraised of all the suppressed evidence, the sentencing phase of Bell's trial could have had a different result.  Although, as is discussed later, the court finds that Bell still would have been convicted of Charles Mims's murder, there would have been enough doubt about the way in which Charles Mims died that the jury might well have decided to recommend a sentence of life instead of death.  The Eleventh Circuit has held that emphasizing "lingering doubt" in the penalty phase of a capital trial can be an effective strategy.  <u>Tarver v. Hopper</u>, 169 F.3d 710 (11th Cir. 1999).  At Bell's trial, ten

jurors voted to recommend the death penalty and two voted for
life imprisonment.  Under Alabama law, if only nine jurors
had recommended a sentence of death, the jury's
recommendation would have been for a sentence of life rather
than death.  1975 Ala. Code § 13A-5-46(f).  The court has no
difficulty believing that there is a reasonable probability
that the added uncertainty that would have been added by the
suppressed evidence could have changed one more juror's mind.

However, the court concludes that Bell has not shown
that there is a reasonable probability, even had the
suppressed evidence been turned over to the defense, that the
guilt phase of Bell's trial would have had a different
outcome.  Even if the jury had discounted Austin and
Hubbard's testimony that Bell murdered Charles Mims by
himself, there was enough other evidence presented at Bell's
trial that the jury would still have convicted Bell.  First,
Austin was consistent in his statement that Bell was involved
in the murder; he was inconsistent only about who the shooter
was.  Second, other evidence offered at trial showed that

Bell and Hubbard arranged to meet Charles Mims on the evening of December 14, 1981, in order to sell him some stolen goods; that Charles Mims had a large amount of money with him an hour or so before he met them; that Bell's car and Charles Mims's truck were both parked at the campgrounds, and a short time later Charles Mims's car but not Bell's truck were there; that Bell got new license plates on December 15; that Bell's car was found some time later in Georgia and someone had cleaned out the trunk of Bell's car with cleaning products and had left ammunition in the trunk of the car; and that Bell told his ex-girlfriend that she "knew too much" when she asked about seeing his car near Mims's truck at the campground on the night Mims disappeared.  Finally, although Charles Mims's body was not recovered, both Charles Mims's wife and his mother testified at trial that he was devoted to his family and that he supported them, and that they had not heard from him since December 14, 1981; this is very strong evidence that he was killed on that night and that Bell was, at least, involved.  In other words, this evidence

130

strongly indicates that Bell was involved in some way in robbing and murdering Charles Mims; what is very much up in the air if all the evidence, including the suppressed evidence, is considered is who shot Charles Mims.

Accordingly, the court concludes that there is a reasonable probability that, had the suppressed evidence been disclosed to the defense, the penalty phase, but not the guilt phase, of Bell's trial would have had a different outcome. The court will grant Bell's petition as to his death sentence but not as to his guilt.

## B.  Giglio analysis

Under Giglio and Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173 (1959), due process is violated when the State knowingly uses false evidence, or allows false evidence to go uncorrected. Carr v. Schofield, 364 F.3d 1246, 1254 (11th Cir. 2004); Giglio, 405 U.S. at 153-54, 92 S. Ct. at 766; Napue, 360 U.S. at 269, 79 S.Ct. at 1177). In order to show a Giglio violation, the petitioner must show that the

prosecutor "knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material."   United States v. Dickerson, 248 F.3d 1036, 1041 (11th Cir. 2001).

Bell alleges that Austin committed perjury at trial when he gave testimony inconsistent with his January 12 pretrial statement.  Specifically, Austin testified that he had spoken to Bell on the night of Charles Mims's disappearance, and that Bell had admitted to robbing Charles Mims, but did not say that he had spoken to Bell several days later, nor did he say that Bell told him that he and Hubbard had both shot Charles Mims.   In particular, Bell argues that Austin perjured himself on cross-examination.  Bell's attorney was questioning Austin about what Bell said happened on the night of December 14, and he asked Austin, "Did Randy [Bell] tell you that Michael Joe [Hubbard] did anything on that occasion?"  Austin replied, "No--no, not on that occasion he

132

did not tell me."[156]  This, Bell argues, was false because Bell told Austin that Hubbard shot Mims first.

The court is unable to conclude by a preponderance of the evidence that Austin committed perjury at trial. See Hays v. Alabama, 85 F.3d 1492, 1499 (11th Cir. 1996) (there is no due process violation where a witness's testimony is inconsistent with prior testimony but there has been no showing that the earlier statement was true and the later statement was false).  Logically speaking, there are four possible ways to interpret Austin's various statements. First, his January 12 statement may have been true and his trial testimony may have been false.  Second, both his January 12 statement and his trial testimony may have been concocted in order to please the police.  As explained above, it would have been reasonable for the jury to conclude that one of these two things was the case if they had known about Austin's January 12 statement and Hill's threat to Austin.

---

156.    Trial transcript, p. 279.

In either of these two scenarios, Austin perjured himself at trial.

Third, Austin's trial testimony could have been true and his January 12 statement could have been false; in which case, of course, he did not perjure himself at trial.  This is the position that the respondents now urge, although, as noted above, there is no particular reason to think that this is the case, other than Investigator Mims's and Agent Perdue's generalizations that in their experience Austin often lied at first but then told the truth.  Fourth, it is possible that both Austin's January 12 statement and his trial testimony were true; this would be the case if Austin had two separate conversations about Charles Mims with Bell. In this case, Austin did not technically perjure himself at trial when he stated that Bell did not tell him "on that occasion," namely the night of Mim's disappearance, that Hubbard "did anything," because in fact Bell told him that Hubbard did something--shot Charles Mims--a few days later.

Although this court noted in its 2001 order in this case
that there was no evidence to support the contention that
Austin had two conversations with Bell, one on the night of
Charles Mims's disappearance and one a few days later, <u>Bell</u>,
2001 WL 1772140, *27, Austin's deposition testimony suggests
that this might have been the case.  Austin stated, "[A]s far
as [Bell] coming by my house that night, that was true.  You
know he came by my house that night, you know, and, you know,
with a flat tire.  Yes, he did.  He came by my house."[157]
However, Austin also said, "The only thing that I remember
is what Randy told me.  That's what sticks out vivid in my
mind.  That's the only thing that I remember.  I remember
that he told me that Michael Joe Hubbard shot Charles
Mims."[158]

---

157.    Austin deposition, Petitioner's exhibit 73, p.
38.  See also <u>id</u>. at 40 ("I was sitting there watching the
Monday night game, and he had a flat tire.  You know what
I'm saying?  So as far as that part, that's true, you know.
He came by my house, man, you know.")

158.    <u>Id</u>. at 46.

This is certainly not the only conclusion that could be drawn from Austin's deposition.  At one point he seemed to indicate that his January 12 statement was untrue.  The respondents' attorney asked, "And in your [January 12] statement you said, Several days after Charles Mims disappeared, then [Bell] told you some things.  Was that the truth?"  Austin answered, "I'm not for sure, man, on that."[159]  However, at another point he indicated that his trial testimony was not true; he said, "I really don't think that Randy told me when he came over that first night that-- nothing about this, you know, this incident.  And I think that it was several days after, you know, that he told me about what happened."[160]    Austin's uncertainty about these crucial points is consistent with the poor memory he demonstrated throughout his deposition.  Austin seemed unclear about almost everything that happened in the early 1980s.  For instance, as discussed earlier, until shown a

---

159.    Id. at 67.

160.    Id. at 74.

transcript of his testimony at Bell's trial, Austin stated

that he had testified _for_ Bell by testifying that Bell had

said Hubbard shot Charles Mims.  The fact that Austin

remembered something that did not, in fact, occur lends

credence to the idea that both his January 12 statement and

his trial testimony could be false.

In short, the court cannot conclude by a preponderance

of the evidence which, if any, of Austin's statements were

true and which were false, and thus cannot conclude whether

or not he perjured himself at trial.[161]

─────────────────

161.     The fact that the court cannot now conclude by
a preponderance of the evidence that Austin's trial
testimony was false does not contradict the earlier finding,
that had all the suppressed evidence been disclosed to the
defense that there is a reasonable probability the outcome
of Bell's sentence would have been different.  In order to
prove materiality under the Brady standard Bell does not
need to show "by a preponderance of the evidence that
disclosure would have resulted ultimately in the defendant's
acquittal."  Hays v. Alabama, 85 F.3d 1492, 1498 (11th Cir.
1996).  Further, the jury could easily have found Austin was
lacking in credibility even if he did not technically
perjure himself at trial.  Even if he did not perjure
himself, he still either he lied in his first statement to
the police or failed to tell the jury on direct examination
about one very relevant conversation with Bell.  Under
either of these scenarios, the jury's confidence in Austin's
(continued...)

137

The court notes that had Austin been questioned at trial in 1983 about his inconsistent statements, it might have been clear which of his statements was accurate.  Of course, this is exactly why the January 12 statement should have been turned over to the defense before trial, and why the court grants Bell relief on his <u>Brady</u> claim.  At this point, however, the passage of time and Austin's heavy drug use has made Austin's memory so poor that the court is not able to conclude by a preponderance of the evidence whether he committed perjury at trial or not.  Thus, the court must deny Bell relief on the basis of his <u>Giglio</u> claim.


## VI.  CONCLUSION

For the reasons explained above, Bell's petition for habeas-corpus relief is due to be granted on his claim that his due process was violated by the State's failure to

---

161.     (...continued)
credibility would have been severely shaken by an impeachment based on his inconsistencies or incompleteness.

disclose material, favorable evidence to him, to the extent

that he is entitled to a new sentencing hearing.

An appropriate judgment will be entered.

DONE, this the 25th day of May, 2005.

　　　　　　　　　　　　　　 /s/ Myron H. Thompson
　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE